STATE BOARD OF AGRICULTURE *v.* AUDITOR GENERAL.

1. COLLEGES AND UNIVERSITIES—STATE BOARD OF AGRICULTURE—CONSTITUTIONAL LAW.

Under the Constitution (Art. 11, §§ 7, 8), the State board of agriculture, having the management and control of the Agricultural College, is made a body corporate and given exclusive control of all of its funds, including appropriations by the legislature.

2. SAME—STATUTES — CONSTITUTIONAL LAW—STATE ADMINISTRATIVE BOARD MAY NOT CONTROL COLLEGE FUNDS.

The condition attached by Act No. 308, Pub. Acts 1923, that the money thereby appropriated to the State board of agriculture for the purpose of carrying on agricultural extension work in co-operation with the United States department of agriculture should be subject to the general supervisory control of the State administrative board, *held*, beyond the power of the legislature to impose, being in conflict with the Constitution (Art. 11, § 8) giving to the State board of agriculture exclusive control of all of its funds.

3. SAME—CONSTITUTIONAL LAW.

The State administrative board, in attempting to exercise general supervisory control of money appropriated by the legislature to the State board of agriculture, in pursuance of the provisions of Act No. 308, Pub. Acts 1923, was assuming to exercise authority vested by the Constitution solely in the State board of agriculture.

4. STATUTES — CONSTRUCTION — CONSTITUTIONAL LAW — COLLEGES AND UNIVERSITIES—UNCONSTITUTIONALITY OF PART OF ACT DOES NOT NULLIFY BALANCE.

Although the attempt of the legislature to confer on the State administrative board general supervisory control over funds appropriated by Act No. 308, Pub. Acts 1923, to the State board of agriculture must fail because in conflict with the Constitution (Art. 11, § 8), said attempt did not nullify the balance of the act.

226—Mich.—27.

5. MANDAMUS—AUDITOR GENERAL—COLLEGES AND UNIVERSITIES.
     Mandamus will issue to compel the auditor general to
     issue his warrant in favor of the State board of agriculture
     for moneys appropriated to it by the legislature; the State
     administrative board, in directing him to withhold said
     warrant, exceeding its authority.
     BIRD, FELLOWS, and WIEST, JJ., dissenting.

Mandamus by the State board of agriculture to compel Oramel B. Fuller, auditor general, and others to draw a warrant for a legislative appropriation. Submitted November 13, 1923. (Calendar No. 31,180.) Writ granted February 1, 1924.

*William L. Carpenter, John W. Beaumont,* and *Hal H. Smith,* for plaintiff.

*Andrew B. Dougherty,* Attorney General, *Clare Retan,* Deputy Attorney General, and *Fred L. Warner,* Assistant Attorney General, for defendants.

MOORE, J.    The writ of mandamus is sought to compel the auditor general to issue his warrant on the State treasurer in favor of the Michigan Agricultural College for $75,000.    The State administrative board is made a party defendant for the reason that the auditor general refuses to issue said warrant because said board has directed him not to do so.

This proceeding calls for a construction of Act No. 308, Pub. Acts 1923, which reads:

"For carrying on the co-operative agricultural extension work under the provisions of an act of congress approved May eight, nineteen hundred fourteen, entitled 'An act to provide for co-operative extension work between the agricultural colleges for the several States receiving the benefits of an act of congress approved July two, eighteen hundred sixty-two, and acts supplementary thereto, and the United States department of agriculture,' and such other extension work as the State board of agriculture may designate, the sum of

| | For Fiscal Year 1923-1924 | For Fiscal Year 1924-1925 |
|---|---|---|
| Annual appropriation for extension work .............. | $150,000.00 | $150,000.00 |
| Special fund for research work. | 35,000.00 | 35,000.00 |
| Horticultural building including green house and equipment.. | 200,000.00 | 200,000.00 |
| Extensions and additions to power house and equipment | 75,000.00 | 75,000.00 |
| Farm and miscellaneous buildings and incidental additions to buildings ................ | 50,000.00 | 50,000.00 |
| Hospital ..................... | 50,000.00 | |
| Totals ................... | $560,000.00 | $510,000.00 |

"Each of said amounts shall be used solely for the specific purposes herein stated, subject to the general supervisory control of the State administrative board."

The act of congress mentioned is known as the Smith-Lever act (38 U. S. Stat. p. 372; 3 Fed. Stat. Ann. [2d Ed.] at page 108). By this act the Federal government appropriated moneys,—

"1. To aid in diffusing among the people of the United States useful and practical information on subjects relating to agriculture and home economics and to inaugurate in each State agricultural extension work to be carried on by the agricultural or land grant colleges, in co-operation with the United States department of agriculture. * * *

"2. The contemplated co-operative extension work to consist of instruction and practical demonstrations in agriculture and home economics to persons not attending or residing in said colleges. This work to be carried on in such manner as may be mutually agreed upon by the United States secretary of agriculture and the agricultural college receiving the benefit of the act. * * *

"3. Before any college receives its share of the Federal appropriation each year, plans for the work to be carried on under this act to be submitted by the

proper officials of each college and approved by the secretary of agriculture.

"4. With the exception of the $10,000 preliminary appropriation above referred to, no payment to be made of Federal funds to any State until an equal sum has been appropriated for such year by the legislature of such State or until it has been provided by the State, county, college, local authority or from individual contributions within the State for the maintenance of the co-operative agricultural extension work provided for in the act."

By Act No. 65, Pub. Acts 1915 (1 Comp. Laws 1915, § 1272), the Michigan legislature accepted the offer made in the Smith-Lever act, "under the terms and conditions expressed in said act."

Section 2 of said act provides:

"The moneys derived by authority of said act shall be exclusively used in support of co-operative agricultural extension work, to be carried on by Michigan Agricultural College, and the secretary of the State board of agriculture is hereby designated as the officer to whom such funds should be paid."

An agreement was made between the Agricultural College and the United States department of agriculture regarding the conduct of said co-operative extension work. It will not be necessary to quote the details of this agreement. In it the parties mutually agreed:

"(a) That all co-operative extension work be planned under the joint supervision of the director of extension work of the college, subject to the approval of the president of the college and the agriculturist in charge of demonstration work for the United States department of agriculture, and subject to the approval of the secretary of agriculture or his representative, and that the approved plans for such extension work in Michigan should be executed through the extension division of said college in accordance with the terms of so-called individual projects agreements.

"(*b*) That all co-operative extension work agents in Michigan, under this and subsequent agreements, be joint representatives of the college and the United States department of agriculture, unless otherwise expressly provided, and that such co-operation be plainly set forth in all literature issued either by the college or said department of agriculture.

"(*c*) That the plans for use of Smith-Lever funds be made by the extension division of the college, but subject to the approval of the secretary of agriculture, and when so approved, be executed by the extension division of the college.

"(*d*) That headquarters of the Michigan organization shall be the Michigan Agricultural College."

A director was appointed by the plaintiff as director of extension work and his appointment was approved by the United States secretary of agriculture and he is now acting in that capacity.

Differences arose between the plaintiff and the State administrative board, which resulted, as before stated, in the auditor general refusing to issue his warrant for any part of the $150,000 appropriated by Act No. 308, Pub. Acts 1923.

The refusal of the defendant to turn over the money is based upon the provision of Act No. 308, Pub. Acts 1923, which reads:

"Each of said amounts shall be used solely for the specific purposes herein stated, subject to the general supervisory control of the State administrative board."

Article 11 of the Constitution of Michigan reads in part:

"SEC. 7.  *  *  *  The members thus elected and their successors in office shall be a body corporate to be known as 'The State Board of Agriculture.'

"SEC. 8.  *  *  *  The board shall have the general supervision of the college, and the direction and control of all agricultural college funds."  *  *  *

Act No. 269, Pub. Acts 1909 (1 Comp. Laws 1915, § 1233 *et seq.*), reads in part:

"SEC. 2. The government of the Michigan Agricultural College shall be vested in the State board of agriculture.

"SEC. 6. * * * The State board of agriculture shall have the general supervision of the Michigan Agricultural College; * * * of all appropriations made by the State or by congress for the support of said college, or for the support of the experiment station or any sub-station, or for any other purpose for which said college is created. * * *

"SEC. 7. The board shall fix the salary of the president, professors and other employees, and shall prescribe their respective duties. * * *

"SEC. 9. The board shall direct the disposition of any moneys appropriated by the legislature or by congress for the Agricultural College." * * *

These provisions of the Constitution and the statute of the State were in force when Act No. 308, Pub. Acts 1923, was enacted, and, it may be safely assumed, were known to the legislature.

We deem it unnecessary to go into a discussion of the question of how far the legislature may go in granting authority to the administrative board to take part in the management of the affairs of the Agricultural College, in view of the constitutional provision we have quoted. Nor do we think we are called upon to say just what was meant by the use of the words "subject to the general supervisory control of the State administrative board." The legislature made a definite appropriation to carry out extension work under the provisions of the Smith-Lever act, "and such other extension work as the State board of agriculture may designate." The language "subject to the general supervisory control of the State administrative board," given in the concluding portion of the act, did not give the board the right to withhold the appropriation.

The writ will issue as prayed, but without costs.

McDONALD, J.    I am in entire disagreement with

the conclusions reached by Justice WIEST in reference to the powers and duties of the State board of agriculture. If his opinion is to prevail we will have completely overturned the well settled policy of the State relative to the management and control of the University and of the Agricultural College. These institutions of learning are very close to the hearts of the people of Michigan. They have made of them the most unique organizations known to the law, in this, that they are constitutional corporations created for the purpose of independently discharging State functions. The people are themselves the incorporators; the boards that control them are responsible only to the people who elect them; they are independent of every other department of the State government. Exercising these functions in this manner, it was quite inevitable that they should come into conflict with the State administrative board to which the legislature has delegated authority to intervene in the affairs and direct the policy of every State institution. Thus this controversy has arisen.

As viewed by the plaintiff, the question involved is whether the State board of agriculture shall continue to exclusively manage the affairs of the college as provided by the Constitution, or surrender its rights to the State administrative board. As it appears to the defendant, the question is whether it may not exercise general supervisory control over funds received by the college by way of appropriations from the legislature without invading the constitutional rights of the State board of agriculture.

The State board of agriculture stands on the same constitutional footing as the board of regents of the University. The progress which our University has made is due in large measure to the fact that the framers of the Constitution of 1850 wisely provided against legislative interference by placing its exclusive management in the hands of a constitutional board

elected by the people. The underlying idea was that the best results would be attained by centering the responsibility in one body independent of the legislature and answerable only to the people. See *Sterling* v. *Regents of University*, 110 Mich. 382 (34 L. R. A. 150). For this reason the Constitution gave the regents the absolute management of the University, and the exclusive control of all funds received for its use. This court has so declared in numerous decisions. *People* v. *Regents of University*, 4 Mich. 98; *Weinberg* v. *Regents of University*, 97 Mich. 254; *Sterling* v. *Regents of University*, *supra*; *Regents of University* v. *Auditor General*, 167 Mich. 444.

The policy thus consistently upheld by the court has proven so satisfactory to the people that in the constitutional convention of 1908 similar action was taken with reference to the Agricultural College. The State board of agriculture was made a constitutional body; it was given the sole management of the affairs of the college and exclusive control of all of its funds. At this time a part of the college funds was received by way of appropriations from the legislature. In providing that the State board of agriculture should have control of the affairs of the college and the funds devoted to its use, the Constitution makes no exception as to funds from any particular source; it says, "All funds." But the contention of my Brother WIEST that moneys appropriated by the legislature are not college funds in the constitutional sense, is answered by Mr. Justice GRANT in *Weinberg* v. *Regents of University*, *supra*.

"When the State appropriates money to the University it passes to the regents, and becomes the property of the University, to be expended under the exclusive direction of the regents, and passes beyond the control of the State through its legislative department."

There is, however, a distinction between funds re-

ceived by way of appropriations and other college funds. The appropriation may be upon condition that the money shall be used for a specific purpose, or upon any other condition that the legislature can lawfully impose. The language used in some previous decisions of this court in reference to this question seems to have been misunderstood. For instance, the following:

"In making appropriations for its support, the legislature may attach any conditions it may deem expedient and wise, and the regents cannot receive the appropriation without complying with the conditions." *Weinberg* v. *Regents of University,* 97 Mich. 246, 254.

Clearly, in saying that the legislature can attach to an appropriation any condition which it may deem expedient and wise, the court had in mind only such a condition as the legislature had power to make. It did not mean that a condition could be imposed that would be an invasion of the constitutional rights and powers of the governing board of the college. It did not mean to say that, in order to avail itself of the money appropriated, the State board of agriculture must turn over to the legislature management and control of the college, or of any of its activities. This logically leads us to a consideration of the character of the condition attached to the appropriation involved in the instant case. Is it a condition that the legislature had power to make? The appropriation (Act No. 308, Pub. Acts 1923) is subject to two conditions, *first,* that the money appropriated shall be used for the specific purpose of carrying on co-operative agricultural extension work under the provisions of an act of congress, known as the "Smith-Lever act (38 U. S. Stat. p. 372)," and *second,* that it "shall be used * * * subject to the general supervisory control of the State administrative board."

It is not an easy matter to separate a supervisory control of the expenditure of money for extension work

from a control of the work itself.    Whatever meaning the legislature intended the term "general supervisory control" to import, there is no question as to the interpretation given to it by the State administrative board.    It appears in the following resolution adopted on July 10, 1923:

"1. That the general supervision of the extension work of the Michigan Agricultural College, together with the authority to hire county agents and all other employees and to prescribe their duties and fix their salaries, be placed by the State board of agriculture by proper resolution, in the hands of the dean of agriculture of the college.

"2. That county agents receive their entire salaries and expenses from the Federal government, the State, or the several counties of the State, but from no other source.

"3. That the dean of agriculture submit to this board immediately a revised budget of salaries and expenses based under the Smith-Lever act, the United States department of agriculture, and the State and county appropriations, and if these funds are insufficient to carry on the work as outlined, the matter be referred to this board for further attention."

From the above resolutions it will be noted that, exercising its legislative right to "general supervisory control," the State administrative board proposes to take the extension work entirely out of the hands of the board of agriculture and give it over to a dean of the college.    In this the State administrative board is assuming to exercise authority vested by the Constitution solely in the board of agriculture.    It is not a question as to the wisdom of the method proposed by the administrative board.    The business policy and management of all of the affairs of the college belongs to the State board of agriculture.    The people, speaking through their Constitution, have so decreed. It is also proposed to reject contributions from county farm bureaus, amounting to $191,489, on the theory that it is not only unlawful but a bad business policy

to allow the bureaus to pay a part of the salaries of employees engaged in extension work. It may be so, but the right to accept or reject contributions to carry on any college activity is a matter to be determined exclusively by the State board of agriculture. The legislature cannot interfere nor can it delegate any authority to the administrative board which it, itself, does not possess. My Brother WIEST justifies the delegation of such authority by the legislature on the ground that it is a part of the present-day legislative policy in carrying out a modern system of State finance. The efficiency of the present system may well be conceded, but it cannot be applied to the affairs of the University or the College, because the Constitution forbids it. The legislative enactments quoted by my Brother, as giving the State administrative board the right to intervene in the affairs of State institutions and direct their expenditures, all relate to institutions over which the legislature has control. The Agricultural College and the University of Michigan are constitutionally immune from such legislation. The legislature has no control over them.

General supervisory control was not a meaningless term with the legislature. As Justice WIEST points out, it had been applied in other appropriation acts of the same session. It was understood to mean that it conferred the right not only to control the expenditure of the money, but to direct the work for which the appropriation was made. It is evident that the legislature intended to confer just such power on the State administrative board as it assumed to exercise in relation to this appropriation. In doing so, it exceeds its powers. This being true, the question arises, Does the unconstitutional provision of the statute nullify the whole act? To hold that it does, we must assume that the legislature would not have made the appropriation except for the fact that the money was to be expended under the general super-

visory control of the State administrative board. The main purpose of the legislature was to grant an appropriation to the college to enable it to carry on its extension work in co-operation with the Federal authorities. A previous legislature had committed the State to that policy. The appropriation was made to support one of the most important activities of the college. In making it the legislature was but obeying the mandate of the Constitution that it should grant appropriations for the support of the college and its various activities (Art. 11, § 10, Const. 1909). It had become a fixed habit with this legislature to confer upon the administrative board general supervisory control over all appropriations. As has been heretofore pointed out, this appears from the various acts enacted at this same session. It is not reasonable to assume, therefore, that it intended the appropriation to fail if for any reason the State administrative board could not exercise a general supervisory control over its expenditure. As we have indicated, the appropriation was necessary to carry on the very important work of taking the college to the people. Its purpose was mainly to benefit those who could not reside at the college. The legislature did not want this work to fail; it knew that an appropriation was necessary if it were to be continued. The main purpose was the appropriation. The supervisory control was but incidental, due to the legislative policy. In these circumstances, we think that the legislature did not intend the appropriation to fail and that the attempt to confer unconstitutional authority on the State administrative board did not nullify the balance of the act. See *State Board of Agriculture* v. *Auditor General*, 180 Mich. 349; *Moreland* v. *Millen*, 126 Mich. 381.

It follows that the State board of agriculture is entitled to the appropriation subject to the condition that it shall be used for the purpose specified. It is

the undoubted right of the administrative board to see that the condition is complied with. We understand that the plaintiff is willing to accept the appropriation on these terms. If so, the money should be paid.

It has been suggested that only by following the fund into the hands of the board of agriculture can the administrative board compel a compliance with the condition as to the manner of its expenditure. As we have pointed out, when the money appropriated passes into the hands of the State board of agriculture, it becomes college property, and is thereafter under the exclusive control of that board, but must be used for the purpose for which it was granted. The proper method of compelling a compliance with the condition that the money shall be expended for the purpose specified will readily suggest itself to the administrative board and its legal advisor.

In view of some statements that have been made, we are led to say that in the action it has taken with reference to the affairs of the college, the State administrative board has been but following out the directions of the legislature in the belief that the greatest efficiency will follow the supervision by the State of all appropriations. But, as we have said, the system adopted, which has apparently produced most satisfactory results when applied to other State institutions, cannot be followed into the business management of the Agricultural College. The Constitution forbids it. The history of the struggles of the University of Michigan for this constitutional policy, under which it has attained its present high standing, may be read in *Sterling* v. *Regents of University, supra,* and cases there cited. The same policy has been adopted for the Agricultural College, and in upholding it we are consistently following the Constitution as interpreted by all of the previous de-

cisions of this court.    For these reasons I concur in the result reached by Mr. Justice MOORE.

The writ of mandamus will issue to the auditor general, but without costs.

CLARK, C. J., and SHARPE and STEERE, JJ., concurred with McDONALD, J.

MOORE, J.    I agree with Justice McDONALD in his construction of the constitutional provision he quotes and the limitation it puts upon the power of the legislature and the administrative board.

WIEST, J. (*dissenting*). We are not in accord with the opinion prepared by Mr. Justice MOORE.

The State board of agriculture is a constitutional body corporate.    It is the duty of the legislature to maintain the State Agricultural College.    Agricultural College funds, designated as such in the Constitution, are wholly under control of the State board of agriculture.    Biennial legislative appropriations are not agricultural funds designated as such in the Constitution.    The constitutional mandate to the legislature to support the Agricultural College does not mean that, in the matter of appropriations, the legislature shall have no voice in the amounts and expenditure thereof.    The Constitution fixes no sum to be appropriated by the legislature for support of the Agricultural College, but leaves the subject to the legislature from session to session in recognition of the fact that the legislature controls the public purse strings.    The Constitution, in making the State board of agriculture a body corporate, has not raised that board above the legislative power of the State in the matter of the expenditure of public funds.    There is another mandate in the Constitution:

"No money shall be paid out of the State treasury except in pursuance of appropriations made by law." Constitution, Art. 10, § 16.

Funds vested in the college by the Constitution are beyond legislative regulation or control. But what the legislature may grant, by way of an appropriation, goes only as given, may be upon condition, and provide for the intervention of a State supervising finance agency with delegated power to be exercised respecting the expenditure. To set aside money in the treasury for a specified purpose does not *eo instante* vest the same in any body. The system of State finance, payment of money and accounting therefor by disbursing officers forbids. The right to the money is measured by the terms of the legislative grant thereof and such terms may impress upon the grant the condition that it shall be devoted to a specific purpose and its expenditure made subject to the general supervisory control of the State administrative board. The right of the legislature to appropriate, with or without condition, beyond general specification of object, is beyond question. If with condition attached, then the only question is the extent and nature of the condition.

In the appropriation act the legislature invoked in comprehensive language the powers theretofore granted the State administrative board. This it had an undoubted right to do. The distinction between an appropriation and its disbursement must be kept in mind. Disbursement of necessity comes after appropriation; official acts intervene. The State administrative board is under legislative mandate to exercise supervisory control over the disbursement of the appropriation in question. The legislature always has had power to ascertain whether an appropriation has been expended by an administrative body for the purpose for which it was made. The legislature also has power, and manifestly the duty, to fix the purpose for which an appropriation may be expended. Coupled with this power is the right to delegate to an administrative body the right of supervision over

the acts of a disbursing body. The power to grant or withhold carries the power to grant on condition, specification of object, delegation of power of supervisory control in a governmental agency and accounting for expenditures.

There is come a time in State finance when a central power, created for the purpose of exercising supervisory control over the expenditures of appropriations, is deemed advisable, and the vesting of this power in the State administrative board, and the command that it be exercised, are not meaningless words. The administrative board was created to stand between appropriations and use thereof, when so invoked by the legislature.

Act No. 2, Pub. Acts 1921 (Comp. Laws Supp. 1922, § 172 [1-9]), created the State administrative board to promote the efficiency of the government of the State and vested in that board, among other things, the power and functions of the State budget commission created by Act No. 98, Pub. Acts 1919 (Comp. Laws Supp. 1922, § 277). The condition attached to the appropriation "subject to the general supervisory control of the State administrative board," is not meaningless if we indulge in a little circumspection. Why designate the State administrative board and invoke its office between the grant of the appropriation and the expenditure thereof? The answer is in section 3 of the State administrative board act:

"The State administrative board shall exercise general supervisory control over the functions and activities of all administrative departments, boards, commissioners, and officers of the State, and of all State institutions. Said board may in its discretion intervene in any matter touching such functions and activities and may by resolution or order, advise or direct the department, board, commission, officer or institution concerned as to the manner in which the function or other activity shall be performed, and may order an interchange or transfer of employees be-

tween departments, boards, commissions and State institutions when necessary. It is hereby made the duty of each and every official and employee connected with any administrative department, office or institution of the State to follow the direction or order so given; and to perform such services in the carrying out of the purposes and intent of this act as may be required by the board. Failure so to do shall be deemed to constitute malfeasance in office and shall be sufficient cause for removal. In no case shall any order issue under this act without the written approval of the governor."

General supervisory control over the expenditure of the appropriation means something more than mere permission to look on without a frown. It means that the legislature invoked all the applicable powers vested in the State administrative board in supervision and control of the expenditure of the appropriation, or it means absolutely nothing. It is found in many other appropriation acts of the same session and indicates a pronounced legislative policy. It is in line with modern State finance and centers supervision, control and responsibility, and notes a departure from the old idea of the sufficiency of legislative disapproval of method of an expenditure of an appropriation disclosed only in an accounting. This is clearly demonstrated in the act creating the State administrative board and in vesting that board with the power and functions of the State budget commission.

In creating the State budget commission the legislature declared:

"The term 'budget system,' established by this act, shall be construed to be a systematic plan of ascertaining and meeting the financial needs of the several departments, institutions, boards, commissions and offices of the State government, and of the controlling State funds."

The legislature imposed a responsibility upon the administrative board and this cannot be met if my

226—Mich.—28.

Brother's opinion prevails. The power under the budget commission act gives the State administrative board recommendatory supervision over appropriations asked for, and the State administrative board act gives general supervisory control over the expenditure of the appropriation granted.

The merits of the issue between the State board of agriculture and the State administrative board cannot be reviewed by this court. If the law vests in the State administrative board general supervisory control over the appropriation, and it has exercised such control, and the State agricultural board feels aggrieved thereby, the remedy is by appeal to the legislative and not to the judicial power.

We have passed upon the law involved; we find the State administrative board exercising power in the premises granted by the legislature. We cannot supervise the supervision exercised.

The writ should be denied.

BIRD and FELLOWS, JJ., concurred with WIEST, J.

BIRD, J. (*dissenting*). I am in full accord with the opinion of Mr. Justice WIEST in this matter, but desire to say a word on the constitutional question raised since that opinion was written. I think every thoughtful man must concede that the legislature could have refused to make this particular appropriation and, if it had, no legal complaint could have been made. If, then, the legislature was in the position where it could give or withhold the appropriation as it saw fit, it was in no different position than a private donor might be who chooses to give the college a donation of like amount with the condition that the Detroit Trust Company should have supervisory control to see that the terms of the donation were complied with. Had some public-spirited citizen made such a donation under the condition indicated, could it be said that the condition was unconstitutional? The private citizen

and the legislature stand in the same position, either could give or withhold. If this be so, then either had a right to annex a condition, and if the gift is accepted by the college it must take it subject to the condition and comply therewith. The only way the college could avoid compliance with the condition would be to refuse the gift. To reach any other conclusion, it must be said that the legislature was under obligation to make this particular donation without condition.

It is argued that the legislature had a constitutional duty to support and maintain the college. Granting this to be so, does it follow that, because it is under a constitutional obligation to maintain the college, it may not make a particular gift upon condition and appoint some agency to see that the condition is complied with? It is indeed a strange process of reasoning to say that the legislature may give or withhold but, if it does give upon condition, that the condition is unconstitutional.

This proposition was very sensibly disposed of in *Weinberg* v. *Regents of University,* 97 Mich. 246, 254, where it was said:

"In making appropriations for its support, the legislature may attach any conditions it may deem expedient and wise, and the regents cannot receive the appropriation without complying with the conditions."

Notwithstanding this court made that statement in the year 1893, it is argued in 1924 that it is of no account, that the college may reach out and lay hold of an appropriation, given upon condition, and ignore the condition on the plea that it is unconstitutional. If this argument be sound, then it must be assumed that the legislature would have made the appropriation regardless of the condition. I do not believe this court is in a position to so hold.

It was said in *Warren* v. *Mayor, etc., of Charlestown,* 2 Gray (Mass.), 84, where the question was discussed:

"If they (the parts of the act) are so mutually connected with and dependent on each other, as conditions, considerations or compensations for each other, as to warrant a belief that the legislature intended them as a whole and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional and connected must fall with them."

"If the void part of the act is the compensation for or the inducement to the valid portion, so that, looking at the whole act, it is reasonably clear that the legislative body would not have enacted the valid portion alone, then the whole act will be held inoperative and void. It is not necessary that the invalid portion of an act of the legislature should have operated as the sole inducement to the passage of the law to render the same void. It will have that effect if the void part to any extent influenced the legislature in passing the statute." 1 Lewis' Sutherland on Statutory Construction (2d Ed.), § 303.

See, also, Cooley's Constitutional Limitations (6th Ed.), p. 211; *People, ex rel. Attorney General,* v. *Sperry & Hutchinson Co.,* 197 Mich. 532 (L. R. A. 1918A, 797).

If it can be said, by any stretch of the imagination, that the condition annexed to the appropriation is void because unconstitutional, then, I insist, the whole act must fail.

FELLOWS, J., concurred with BIRD, J.