**BOARD OF REGENTS FOR the OKLAHOMA AGRICULTURAL AND MECHANICAL COLLEGES Acting For and on Behalf of the MURRAY STATE COLLEGE OF AGRICULTURE AND APPLIED SCIENCE, Appellant,**

v.

**OKLAHOMA STATE REGENTS FOR HIGHER EDUCATION et al., Appellees.**

No. 45459.

Supreme Court of Oklahoma.

May 23, 1972.

E. Moses Frye, Ray Lee Wall, Stillwater, for appellant.

Larry Derryberry, Atty. Gen., Larry L. French, Asst. Atty. Gen., for appellees.

IRWIN, Justice.

This proceeding was commenced by the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, acting for and on behalf of Murray State College of Agriculture and Applied Science, seeking a judicial determination that Senate Bill No. 214 is unconstitutional. The trial court determined it to be constitutional and appellant (plaintiff) challenges that determination in this appeal.

Senate Bill No. 214 (1971 Session Laws, Chapter 128, pgs. 391–392, and codified as 70 O.S.1971, §§ 3407.1 and 3407.2) generally provides that the Oklahoma State Regents for Higher Education shall make a study to determine the feasibility of changing the functions of Murray State College of Agriculture and Applied Science to give predominate emphasis to technical education; that if the State Regents determine that the change should be made, they shall issue a proclamation declaring the change in the functions of the college and specifying the effective date; that thereafter the official name of the college shall be Murray State College of Technology; and there shall be created a Board of Regents of Murray State College of Technology and all governing control of the property, assets and obligations of the present Murray State College shall be transferred to the Board of Regents of the Murray State College of Technology. The enactment then made provisions for the Board of Regents of Murray State College of Technology and the appointment, tenure and duties of the members of the Board.

Pursuant to the above enactment, the Oklahoma State Regents for Higher Education conducted a feasibility study and thereafter approved a Statement of Functions for Murray State College. This statement contained seven functions for the college and one of these stated functions (Number 2) was "to provide an educational program which gives predominant emphasis to technical and occupational education." In a footnote on the Statement of Functions this language was used:

"The term 'predominant' as used in functional statement Number 2 above is interpreted to mean that educational programs of a technical nature be given great emphasis or prominent emphasis in planning the educational program to meet the needs of the people in the area served by the college. The function of technical education is implemented through technical education programs which cut across the several fields of ed-

ucation including business, nursing and other health related education, agriculture, engineering and industrial education, computer science, and other such programs with a mathematical or scientific undergirding. * * *."

On October 27, 1971, the Oklahoma State Regents for Higher Education issued its Proclamation. In this Proclamation the Regents found that the results of the study indicate that the functions of the College should be changed as suggested in Senate Bill 214, and resolved that the functions of the College be changed to provide for a predominant emphasis in technical education, effective November 1, 1971.

The governing control of the property, assets and obligations of Murray State College of Agricultural and Applied Science has been under the Board of Regents for Oklahoma Agricultural and Mechanical Colleges. By virtue of the State Regents' determination and proclamation, and Senate Bill 214, the official name of the College is to be changed; another Board of Regents is to be created for the College; it becomes the duty of the Governor, by and with the consent of the Senate, to appoint seven members to the Board; and all property, assets and obligations of the College are to be transferred to the new Board.

It should be pointed out that the record discloses that the functions for Murray State College, as approved by the Oklahoma State Regents, were for all practical purposes in effect on November 1, 1971. In other words, this cause was presented on the theory that the Statement of Functions for Murray State College had been implemented and in force and effect on November 1, 1971, when the Oklahoma State Regents' Proclamation became effective.

■ We will first consider plaintiff's contention that Senate Bill 214 contravenes Article VI, § 31a, of the Constitution which creates a "Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechani-

cal Schools and Colleges maintained in whole or in part by the State."

Plaintiff argues that the above Constitutional provision requires that Murray State College be governed by it; that the College has always been and continues to be an Agricultural and Mechanical College within the meaning of the Constitution, notwithstanding Senate Bill 214; and that the Legislature does not have the Constitutional authority to create a new governing board for the College.

Section 31a, supra, was adopted at a special election on July 11, 1944, after the Legislature in March 1943, passed Senate Joint Resolution No. 9, (1943 Session Laws, page 340) proposing an amendment to Article VI, § 31, of the Constitution. Under § 31, as adopted in 1907, the State Board of Agriculture was "the Board of Regents of all State Agricultural and Mechanical Colleges." This section was amended in 1913, the amendment changing only the membership of the State Board of Agriculture.

At the time of the adoption of § 31, in 1907, two Universities or Colleges in Oklahoma, had the word "Agricultural" included in their names, i. e., the Oklahoma Agricultural and Mechanical College (now Oklahoma State University) and the Colored Agricultural and Normal University (now Langston University). The Oklahoma Agricultural and Mechanical College was placed under the governing control of the Agricultural and Mechanical College Board of Regents being the State Board of Agriculture, (see Revised Laws of 1910, § 7971); and the Colored Agricultural and Normal University was placed under its own Board of Regents (Revised Laws of 1910, § 8019). The Colored Agricultural and Normal University (name changed to Langston University in 1941; 70 O.S.1941, § 1451a), was not placed under the governing control of the State Board of Agriculture until 1943. See 1943 Session Laws, page 211. Langston University was placed under the Board of Regents of Agricultur-

al and Mechanical Colleges in 1945. See 70 O.S.1951, § 1451b. It therefore appears that since Langston University was named the Colored Agricultural and Normal University until 1941, the Legislature did not construe the word "Agricultural" in its name, as necessarily meaning that it was in fact an Agricultural and Mechanical College within the meaning of § 31. Had it been an Agricultural and Mechanical College within the meaning of § 31, it would seem that § 31 of the Constitution would have required it to be governed by the State Board of Agriculture.

Murray State College was first established as a "district agricultural school of secondary grade", pursuant to Senate Bill No. 109, enacted by the Legislature in 1908. See 1907–08 Session Laws, page 18, § 14, 1910 Revised Session Laws, § 7879. That enactment provided for the establishment "in each of the Supreme Court Judicial Districts a district agricultural school of secondary grade * * *." Another section of that enactment (§ 7671 of the 1910 Revised Session Laws) also provided for the establishment in each of the state normal schools a department to be known as the department of agriculture and industrial education. It would appear that the establishment of an agricultural department in a school or college did not necessarily mean that such school was an agricultural and mechanical school and required to be under the control of the State Board of Agriculture as prescribed by § 31, supra, of the Constitution.

Murray State College was under the control of the State Board of Agriculture at the time § 31 was amended by the adoption of § 31a, supra, in 1944. It was established by Legislative authority; it is not a land grant college; and its control and management are not burdened by any obligations flowing from the 1906 Enabling Act of Congress.

Under the terms of § 31, supra, the State Board of Agriculture was the Board of Regents "of the State Agricultural and Mechanical Colleges." The 1944 amendment of § 31, (§ 31a), created a Board of Regents for one specifically named College (The Oklahoma Agricultural and Mechanical College) and for a "class" of schools and colleges (all Agricultural and Mechanical Schools and Colleges). We find no material difference in the language used in the 1907 proviso and the 1944 proviso. Unlike the language employed in § 8 and § 12 of the 1906 Enabling Act of Congress, which reserved and granted to the State of Oklahoma certain lands for the use and benefit of " * * * the normal schools now established or hereafter to be established * * *", neither § 31, as adopted in 1907, nor the amendment (§ 31a) employed such descriptive language.

There is also a material distinction between § 31a, supra, where only one college is specifically named and other colleges are included by being within a "class", and Article XIII–B, of the Constitution, which places the management and control of six State Colleges (all being specifically named) under the Board of Regents of Oklahoma Colleges, and no other Colleges are included by being within a "class". For clarification, § 1, of Article XIII–B, creates a Board of Regents of Oklahoma Colleges, and § 2 provides that the Board "shall hereafter have the supervision, management and control of the following State Colleges: Central State College at Edmond; East Central State College at Ada; Southwestern Institute of Technology at Weatherford; Southeastern State College at Durant; Northwestern State College at Alva; and the Northeastern State College at Tahlequah, * * *." At one time all of the above State Colleges were designated as "Normal Schools". See Chap. 34, Art. 36, O.S.1931, §§ 7281–7303.

 There is no language in § 31a, expressing an intent that all Agricultural and Mechanical Colleges which were under the management and control of the State Board of Agriculture when § 31a was adopted, shall be under and must continue to be under the management and control of the Board of Regents for the Oklahoma

Agricultural and Mechanical Colleges. The only Colleges or Schools that would be in that category would be "The Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Schools and Colleges." We agree with plaintiff that the Legislature may not constitutionally remove the management and control of a School or College that comes within the meaning of § 31a, from the Board of Regents named therein and place its management and control in another Board. However, if the intent of § 31a, was to "freeze-in" such Schools and Colleges to be under the Board of Regents created therein, although such Schools and Colleges at some future date may not fall within the meaning of an Agricultural and Mechanical School or College, language would have been employed expressing such an intent. Absent such language, we hold that when a School or College ceases to be an Agricultural and Mechanical School or College within the meaning of § 31a, supra, that said section does not require that such School or College be under the management and control of the Board of Regents for the Agricultural and Mechanical Colleges.

The Legislature has the constitutional power and authority to create a new governing Board for Murray State College if it ceases to be an Agricultural and Mechanical College. This is so for the reason that Article V, § 36, of the Constitution provides that the authority of the Legislature shall extend to all rightful subjects of legislation; there is no constitutional provision vesting such power and authority in another department, board or commission; and there is no constitutional prohibition prohibiting the Legislature from exercising such power and authority. See Tate v. Logan, Okl., 362 P.2d 670, wherein we said that we do not look to the Constitution to determine whether the Legislature is authorized to do an act but rather to see if it is prohibited.

■ The next issue to be considered is whether or not Murray State College,

when its functions were changed to give predominant emphasis to technical education, is an Agricultural and Mechanical College within the meaning of § 31a. The trial court in its journal entry of judgment dated December 30, 1971, found from the evidence submitted, that during this year's fall term there were 126 full time equivalent students studying agriculture at Murray State College out of an enrollment of 869 students and the agricultural courses constituted 5.1% of the total credit hours at the college; that the resolution adopted by the Oklahoma State Regents for Higher Education provided that the predominant emphasis of the College be changed to technical education; and that henceforth, the predominant function of the college will be that of a technical school as opposed to an agricultural and mechanical school.

Plaintiff argues that the trial court erred in its finding that the predominant functions of Murray State College is that of a technical school as opposed to an agricultural and mechanical school; and that such a finding declares in effect that if an institution is not predominantly agricultural and mechanical it is not an agricultural and mechanical institution. Plaintiff also argues that § 31a, requires that so long as any part of an institution is agricultural and mechanical it must be governed by the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges, and that the function change of Murray State College to give predominant emphasis to technical education does not eliminate any agricultural and mechanical functions, but in fact increases the agricultural and mechanical functions of the institution.

Dr. Clyde R. Kindell, President of Murray State College, testified that there were no plans to eliminate any agricultural and mechanical art subjects or agricultural and mechanical functions at the College, but that a request had been submitted to the State Regents to increase the agricultural and mechanical programs. Dr. Kindell was of the opinion that Murray State Col-

lege would continue to be an Agricultural and Mechanical College although the functions of the College had been changed. In response to a question if the College would be predominantly agricultural and mechanical, he stated: "It depends on the definition of predominant. As it is, there had been the enrollment, the largest percent of enrollment in any one department is agriculture. If you think in terms of predominant as being fifty-one percent or more, no, fifty-one percent or more of the enrollees are not" and "as far as departmentalwise in relation to all other departments, agriculture is predominant, if we think in terms of agriculture compared to other courses." The Court ask the following question: "Do you have an opinion if you do implement with curriculum, as the new functions would appear, do you have any basis for determining in your mind what would then be predominant?" Dr. Kindell answered: "No Sir".

Dr. E. T. Dunlap, Chancellor of the Oklahoma State Regents for Higher Education, testified that the institutions now governed by the Board of Regents of A & M Colleges vary in their functions and programs and that institutional names and institutional functions are two different things. Dr. Dunlap pointed out that although Northeastern Oklahoma A & M College has an A & M name, that institution is predominantly a comprehensive junior college in its operation, and its functions are junior college education with programs of study being in various and sundry fields of junior college education. Dr. Dunlap testified that an A & M function, as such, is a misnomer and the name applies in the designation of an institution, but what an institution does in its functions and in its programs or courses of study is the thing to look to in determining what kind of education it carries on.

Dr. Dunlap further testified that Murray State College does not have an agricultural and mechanical function; and that "it teaches some courses of study in the field of agriculture and in the field of mechanical arts, yes. That is not a function though", and "we teach agriculture at many colleges, nearly every college in Oklahoma."

By virtue of Article XIII-A, § 2, of the Constitution, to be discussed later, the Oklahoma State Regents for Higher Education has the Constitutional power and duty to prescribe standards of education and to determine the functions and courses of study at Murray State College; and it has determined that the functions of the College be changed to provide predominant emphasis to technical education. Although agricultural and mechanical courses will continue to be offered, the trial court's determination that henceforth the predominant function of Murray State College will be that of a technical school as opposed to an Agricultural and Mechanical school is supported by the evidence.

This conclusion brings us to one of the crucial issues presented in these proceedings and that is: When an institution offers courses in agriculture and other allied courses of study, but its courses of study and functions give predominant emphasis to technical education, which cuts across the several fields of education, is such institution an Agricultural and Mechanical College within the meaning of § 31a, supra?

█ Our Constitution is not helpful in resolving the above issue for the simple reason it does not prescribe an operational definition of what constitutes an Agricultural and Mechanical College. However, implicit in the enactment of Senate Bill 214, is a legislative construction and determination that if the functions of an institution give predominant emphasis to technical education, that such institution would not constitute an Agricultural and Mechanical College within the meaning of § 31a, supra. This is so for the reason there is a presumption that any Legislative enactment is constitutional and that the Legislature would not enact an unconstitutional law. See Schmitt v. Hunt, Okl., 359 P.2d 198. Also, in the Schmitt case we said that in

the consideration of any act of the Legislature it must be borne in mind that such an act should be held to be constitutional unless its unconstitutionality is shown beyond a reasonable doubt.

In State ex rel. Kerr v. Grand River Dam Authority, 195 Okl. 8, 154 P.2d 946, we said that Legislatures, like courts, must function within constitutional limitations and it is presumed that it acts with a conscious regard thereof, and a legislative construction of the Constitution is deemed highly persuasive by the courts.

In its Statement of Functions for Murray State College, the Oklahoma State Regents said the College was "to provide an educational program which gives predominant emphasis to technical and occupational education." The technical educational programs, which carry out these functions, cut across several fields of education, including business, nursing, agriculture, engineering and industrial education. As stated by the Oklahoma State Regents in its Statement of Functions for Murray State College, this stepped-up emphasis on technical education is responsive to the needs of the people in the area served by Murray State College.

We hold that when an institution offers courses of study in agriculture and other allied courses of study, but its courses of study and functions give predominant emphasis to technical education, which cuts across the several fields of education, such institution is not an Agricultural and Mechanical College within the meaning of Article VI, § 31a, of the Constitution.

■ Plaintiff contends that Senate Bill 214, is an unconstitutional delegation of legislative authority to the Oklahoma State Regents for Higher Education. Plaintiff argues that the Legislature has delegated to the Regents the power to (1) designate or define what constitutes an Agricultural and Mechanical College, (2) make the "law" by their determination that a change should be made, rather than to apply facts to the law, or determine facts upon which the law is operative, (3) determine that an

agricultural and mechanical college ceases to be an agricultural and mechanical college when technology functions are added, and (4) leaves to the Regents the authority to remove an institution from the management and control of an existing constitutional governing board (i. e., the Board of Regents for Oklahoma Agricultural and Mechanical Colleges) and to create a new governing board.

Prior to the adoption of § 31a, supra, in 1944, the people of Oklahoma recognized that a change in economics, social values, educational requirements or needs in a particular area, might dictate a necessity for a change in the standards of higher education and the functions and courses of study in some or all State institutions of higher learning. In March 1941, Article XIII–A, of the Constitution was adopted. Section 1 of that Article provides that all institutions of higher education supported in whole or in part by direct legislative appropriations shall be integral parts of a unified system to be known as "The Oklahoma State System of Higher Education." Section 2, established the Oklahoma State Regents for Higher Education which is a co-ordinating board of control for all State institutions that are a part of the Oklahoma State system of Higher Education. This section expressly provides that the State Regents shall prescribe standards of education applicable to each institution, and it shall determine the functions and courses of study in each of the institutions to conform to the standards prescribed. Section 3 provides that appropriations by the Legislature for all such institutions shall be made in consolidated form without reference to any particular institution and the State Regents shall allocate to each institution according to its needs and functions.

■ The Oklahoma State Regents for Higher Education changed the functions of Murray State College to provide for a predominant emphasis in technical education which they were constitutionally authorized to do. The State Regents had this constitutional power and authority with or with-

out the benefit of Senate Bill 214. Although the State Regents may have acted pursuant to Senate Bill 214, their authority to act springs from the Constitution.

Plaintiff's contention that Senate Bill 214 constitutes an unlawful delegation of Legislative authority to the State Regents presents an issue similar to an issue in Schmitt v. Hunt, Okl., 359 P.2d 198, wherein it was contended that the 1959 Merit System Law · (74 O.S.Supp.1959, Chap. 27) was unconstitutional. In upholding the constitutionality of that Act we held that it did not become effective or operative until such time as the Executive Order was actually issued to any particular department or agency of goverment and we said that a Legislative enactment may ordinarily provide that it will take effect on the happening of some future event.

Under Senate Bill 214, the provisions therein which changed the name of the College; created a new Board of Regents; and transferred control of the property, assets and obligations of the College, did not become effective or operative until the functions of Murray State College were changed by the State Regents. The State Regents' action in changing the functions of Murray State College and placing in effect those changes in functions, were the events that made effective and operative the remaining portion of Senate Bill 214.

Senate Bill 214 did not authorize the State Regents to designate or define what would constitute an Agricultural and Mechanical College nor did it delegate to the State Regents the power to change the governing control of Murray State College. The State Regents' action in changing the functions of the college to give predominant emphasis to technical education was not in conflict with their constitutional powers and duties. The Legislature determined that the management and control of Murray State College would be changed in the event the functions of the College were changed by the State Regents. We hold that Senate Bill 214 is not an unlawful del-

egation of Legislative authority to the State Regents.

■ Plaintiff contends that the Oklahoma State Regents for Higher Education did not satisfy the requirements of 70 O.S. 1971, § 3208, before it changed the functions of Murray State College to give predominant emphasis to technical education.

Section 3208, supra, relates to the functions and courses of study at institutions and hearings before changes may be made. It provides that the "State Regents shall afford any and all institutions affected a full public hearing, after such notice as may be prescribed by the State Regents, before ordering any change, and shall allow sufficient time before final action is taken for the said institution or institutions to prepare and present it or their arguments and briefs in support of or in opposition to any such proposed change." Whether the Legislature could constitutionally establish a procedure for the State Regents to carry out their constitutional duties is not herein considered.

The trial court in its journal entry of judgment found: "Although there is conflict in the evidence as to the notice given to Murray State College pursuant to Title 70 O.S. 3208, the Court finds that it was insufficient under this statute as the hearing which was originally scheduled for the 27th day of October, 1971, was actually heard on the 26th and that insufficient time was given to the institution's president to permit him to be present at the hearing. However, there was a meeting before the Board of Regents on the 8th day of November, 1971, to reconsider the change of the functions and courses of study at Murray State College at which time President Kindell of the college was present together with other interested parties and the Court finds that this hearing did satisfy the requirements as to notice prescribed by the statute last referred to, and the State Regents for Higher Education, in effect, ratified their Resolution No. 731, by refusing to change or rescind it."

There is nothing in the record indicating that the State Regents intentionally failed to give reasonable notice of the hearing originally scheduled for October 27, 1971, or that all interested parties, including Dr. Kindell, President of Murray State College, did not attend meetings of which they had reasonable notice. It appears from the record that there may have been a misunderstanding of the scheduled meetings.

We agree with the trial court that the actions of the State Regents changing the functions of Murray State College should not be vacated because the State Regents did not strictly comply with the requirements of § 3208, supra. In our opinion, the hearings and notices thereof, in the State Regents' final determination that the functions of Murray State College should be changed, sufficiently satisfies the requirements of § 3208, supra.

■ Plaintiff contends that Senate Bill 214 contravenes Article V, § 59 of the Oklahoma Constitution which provides that "Laws of a general nature shall have a uniform operation throughout the State, and where a general law can be made applicable, no special law shall be enacted."

Plaintiff argues that Murray State College is one of eight Agricultural and Mechanical Colleges in Oklahoma; that Senate Bill 214 is applicable to only Murray State College; that if a feasibility study were necessary, general legislation should have been enacted directing a feasibility study in regard to changing the functions of all institutions in the same class as Murray State College.

As previously stated, the sole authority for determining the functions and courses of study of each of the institutions in the Oklahoma State System of Higher Education is vested in the Oklahoma State Regents for Higher Education by Art. XIII–A, § 2, of the Constitution. Senate Bill 214 neither attempts to enlarge nor diminish the State Regent's Constitutional powers of determining the functions and courses of study of each of the institutions. The State Regents had the Constitutional authority to conduct a feasibility study and to change the functions and courses of study at Murray State College or any other institution with or without Legislative enactment or approval. We hold that Senate Bill 214 does not contravene Article V, § 59, of the Oklahoma Constitution.

Judgment affirmed.

BERRY, C. J., DAVISON, V. C. J., and WILLIAMS, JACKSON, HODGES, LAVENDER and McINERNEY, JJ., concur.

BARNES, J., dissents.

BARNES, Justice (dissenting):

I cannot concur in the Majority Opinion. As I read the Oklahoma Constitution, the voters of Oklahoma have historically withheld from the Legislature the power to vest control of this State's Agricultural and Mechanical Colleges in any body other than one designated by the Constitution itself. And this started with the adoption of that Constitution in 1907.

In territorial days, when the school now named "Oklahoma State University" (hereinafter referred to as "A & M") was established in Payne County, it was governed by a statutory board of regents known as the "Agricultural and Mechanical College Board of Regents", usually referred to herein as the "A & M Board" (see Stats. of Okla., 1893, § 142, referred to in the Historical note to R.L. 1910, § 7971, cited in the Majority Opinion). The adoption of the Oklahoma Constitution changed this. It made clear the intention of Oklahoma electors that A & M thenceforth was to be governed by a *constitutional Board,* which, at the time this Court's opinion in Trapp v. Cook Const. Co., 24 Okl. 850, 105 P. 667, was promulgated in 1909, was the State Board of Agriculture. There, this Court held that Art. 6, § 31, of the Constitution vested in this State's Board of Agriculture, as the Board of Regents of all State Agricultural and Mechanical Colleges, the same power, jurisdiction, and authority over A

& M that was possessed by the previous territorial board of regents. The Court referred to the fact that this power consisted of doing all things necessary to make the college effective as an educational institution, and held that, by reason thereof, a portion of a certain statute, insofar as it purported to confer duties, encompassed in such power, on the state board of public affairs, exceeded the Legislature's authority and was unconstitutional.

Murray State College of Agriculture and Applied Science (hereinafter referred to as "Murray") was established under the name of "Murray School of Agriculture", as a "district agricultural school", under the 1908 Legislature's Senate Bill No. 109 (S. L.1907–1908, ch. 3, Art. III, pp. 13–20, both incl.), which placed it under the ultimate control of the State Board of Agriculture. That control was emphatically continued into the period after it became a college. See S.L.1923–4, ch. 69, pp. 85–86.

The Majority Opinion seems to recognize that in 1944, when the voters amended Art. 6, § 31, of the Oklahoma Constitution and transferred the governing control of the board of regents (which we upheld against attempted legislative encroachment in Trapp, supra) from the State Board of Argiculture to the A & M Board, by adopting § 31a, Murray was one of the agricultural and mechanical schools and colleges encompassed in said amendment's wording:

> "There is hereby created a Board of Regents for . . . *all* Agricultural and Mechanical Schools and Colleges maintained in whole or in part by the State." (Emphasis added)

The position of an institutional Board of Regents, designated as such by the Constitution, is unique. While the members of the A & M Board are, of course, not elected directly by the people as were the members of the Board involved in Christie v. Board of Regents of University of Michigan, 364 Mich. 202, 111 N.W.2d 30, that fact is not a decisive consideration in evaluating its power as a constitutional board,

as evidenced by Trapp, supra. More important in making such a board independent of legislative direction and control are the facts referred to in Sterling v. Regents of University, 110 Mich. 369, 68 N.W. 253, 34 L.R.A. 150. To paraphrase the Michigan Court's language, these facts are: (1) The Board and the Legislature derive their power from the same supreme authority, the Constitution; (2) direct power *conferred upon one necessarily excludes* its existence *in the other, in the absence* of language showing a contrary intent; (3) the Board is not mentioned in the portions of the Constitution referring to powers and duties of the Legislature; nor, in the portions of the Constitution relating to the Board, is there any language which can be construed as conferring on the Legislature governing control of Agricultural and Mechanical Colleges maintained in whole or in part by the State. As to the A & M Board and the Oklahoma Legislature, I think it must be concluded, as did the Michigan Court with regard to the University Board and Legislature of that State:

> "They are separate and distinct constitutional bodies, with the powers of the Regents defined. By no rule of construction can it be held that either can encroach upon or exercise the powers conferred upon the other."

I have no quarrel with the rule set out in Tate v. Logan, Okl., 362 P.2d 670, referred to in the Majority, but that rule is not applicable here because the constitutional provision expressly includes "all State Agricultural and Mechanical Schools and Colleges . . ." Thus, this constitutional mandate prohibits legislation of contrary effect quite as effectively as if the prohibition was written into it in precise and affirmative terms. More pertinent to the matter is the well-established rules this Court recognized and followed in Grim v. Cordell, 197 Okl. 144, 169 P.2d 567, and Thomas v. Reid, 142 Okl. 38, 285 P. 92, and the Nebraska Court announced in State ex rel. Crounse v. Bartley (1894), 40 Neb. 298, 58 N.W. 966, and State ex rel. Bottcher v. Bartling, 149 Neb. 491, 31 N.

W.2d 422. In Grim, we held that legislative authority may be limited by restrictions that are *implied* (as well as expressed) in the Constitution. See also Flaska v. State, 51 N.M. 13, 24, 25, 177 P. 2d 174, 181, and 16 Am.Jur.2d, "Constitutional Law", § 230, and the cases cited under footnote 20, page 480, of said Volume. To paraphrase what was said in State ex rel. University of Minnesota v. Chase, 175 Minn. 259, 220 N.W. 951:

> The whole power to govern the Agricultural and Mechanical Colleges was put in that Board by the people. *So no part of it can be put elsewhere but by the people themselves.*

> With the Legislature's policy this Court has nothing to do. But recognizing the mandate of the Oklahoma Constitution, we must give it effect when litigation before us furnishes the occasion and imposes the duty of deciding which of two conflicting enactments we must enforce, the paramount rule of the Constitution, or the subordinate law of the Legislature. The Constitution of this State has declared, in effect, that the management of these colleges, *until the people themselves say otherwise,* shall be in a relatively small, slowly changing board. The purpose of our Constitution remains clear. It was to put the management of these state educational institutions (directly quoting)

> ". . . beyond the dangers of vacillating policy, ill-informed or careless meddling and partisan ambition that would be possible in the case of management by either Legislature or executive, chosen at frequent intervals and for functions and because of qualities and activities vastly different from those which qualify for the management of an institution of higher education. * * * Constitutional limitations are not to be ignored because no harm has come from past infractions or because a proposed violation has a commendable purpose. 'The tendency to sacrifice established principles of constitutional government

in order to secure centralized control and high efficiency in administration may easily be carried so far as to endanger the very foundations upon which our system of government rests.' (Citation) It is in such fashion that the friends of free government may sap its foundations by measures they intend for its benefit."

The Majority Opinion *does not directly* deny that when Oklahoma's electorate, by adoption of § 31a as an amendment of § 31, made the A & M Board the board of regents for Murray (and other Agricultural and Mechanical Schools) that Board was vested with the same control over Murray that this Court had held in Trapp, supra, was given to the State Board of Agriculture over the A & M College in Payne County by § 31, i. e., the power to "do all things necessary to make the *college effective as an educational institution*" (105 P. 668). But the Majority Opinion seems to hold that this power of governing control (which the courts have upheld against legislative encroachment) has been lost by the A & M Board, on the theory that Murray has ceased to be an Agricultural and Mechanical College, simply upon the basis of the criteria formulated in Senate Bill 214, i. e., by changing its function so as to give "predominant emphasis" to technical education. The Majority Opinion upholds the Thirty-third Legislature's right to formulate this criteria as a "legislative construction and determination" of the question of *when* Murray ceases to become an Agricultural and Mechanical College. Rather paradoxically that opinion also holds that the Oklahoma State Regents for Higher Education (hereinafter referred to as "State Regents") has the constitutional power to change Murray's functions to provide for predominant emphasis in technical education *without benefit of Senate Bill 214.* I think the Majority Opinion has erred in both of these conclusions because they are based upon power it attributes to the Thirty-third Legislature and to the State Regents—power which neither possesses. If either of these bodies has such power, *it has to be of re-*

*cent acquisition*, because as late as 1965 (approximately twenty-one years after the adoption of § 31a in 1944 and twenty-four years after creation of the State Regents by the adoption of Art. XIII–A in 1941) the Thirtieth Legislature affirmed the A & M Board's governing control over Murray in stronger and more specific language than was used in the Territorial Act (Wilson's Rev. & Ann.St., Okl.1903, § 6408, referred to in Trapp, supra), by its enactment of our Higher Education Code. In the last two paragraphs of § 412 of that Code (S.L.1965, p. 709; 70 O.S.1971, § 3412) that Legislature said:

> "The enumeration herein of certain powers and immunities of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges shall not be construed as in derogation or as a limitation of other powers and immunities *properly belonging to said Board by virtue* of any provisions of *the Constitution* of Oklahoma or of any provision of law. *Said Board*, is hereby, expressly granted *every power necessary or convenient to make institutions under its jurisdiction effective for the purposes for which they were created* and are maintained and operated.

> "Nothing in this section shall be construed as in derogation of the *constitutional powers* and responsibilities *of said Board of Regents* for the Oklahoma Agricultural and Mechanical Colleges, acting as the Board of Regents for Cameron State Agricultural College, Connors State Agricultural College, Eastern Oklahoma Agricultural and Mechanical College, *Murray State Agricultural College*, Northeastern Oklahoma Agricultural and Mechanical College, Panhandle Agricultural and Mechanical College, and Langston University." (Emphasis added)

If the Thirty-third Legislature may not assume power it does not possess (State Board of Agriculture v. State Adm. Board [Mich.], 226 Mich. 417, 197 N.W. 160; in accord, Trapp, supra) to encroach upon the A & M Board's historic governing control of Murray, and a change in that control can only be effected by an amendment of the Constitution, let us examine Art. XIII–A to see if this constitutional amendment effected such a change. Section 2 of that amendment gives the State Regents the following specific powers (among others not material here) over the institutions of higher education comprising the "Oklahoma State System of Higher Education":

> "(1) it shall prescribe *standards of higher education* applicable to each institution;

> "(2) it shall *determine the functions and courses of study* in each of the institutions *to conform to the standards prescribed*; * * *" (Emphasis added)

It will be noted that the only authority concerning functions of the various institutions included in this State's Higher Education System, which "(2)", above, gives the State Regents is the power to "determine the functions and courses of study in each . . . to conform to the standards of higher education" said Regents "shall prescribe" under "(1)", above. Is this the equivalent of authority to change the functions of an A & M College — controlled, under mandate of the Constitution, by the A & M Board — to such an extent that, by the issuance of a proclamation, the State Regents can declare it to be a different kind of college, and, by so doing, enable its removal from the control of its constitutional Board? I think the plain wording of Art. XIII–A shows that it does not contemplate such a vesting of power in the State Regents, as a "coordinating board." In this connection, it will be noted that Art. XIII–A *nowhere in its terms* purports to repeal Art. VI, § 31, nor does it purport to abolish or supersede the various statutory boards of regents of other "integral parts" of the "unified system." And no legislation enacted under the purported authority of Art. XIII–A has undertaken to do so. We know as a matter of history that since this amendment's adoption more than thirty years ago, all these governing

boards have continued to exist and function. Some of them, since, have attained the status of constitutional boards. Obviously, it was not intended to do away with them and to substitute the State Regents as the governing board for all of the institutions. The framers and adopters of Constitutions, equally with the Legislature, are presumed not to have done a vain thing. Moral Ins. Co. v. Cooksey, Okl., 285 P.2d 223. Yet how vain it would be, and what a stupendous waste of time, energy and talent, to maintain a collection of individual boards for the several institutions of higher learning, if these boards must run on every occasion to the State Regents for advance approval of their decisions, or take the risk of having these decisions set aside if the State Regents disapprove. Analysis of Art. XIII–A, § 2, reveals that this amendment's intention is to give the State Regents a much more restricted competence. Its direction to these Regents is not to set up programs of instruction, courses of study, or curricula. It is to prescribe "standards of higher education applicable to each institution." This plainly implies that the State Regents' grant of authority extends only to determining general measurements of excellence rather than to prescribing functions or dictating programs. This is a far cry from changing the function of an institution (from *"the purposes for which they were created"*, Tit. 70, § 3412, supra), based upon "predominant emphasis", which has nothing to do with determining functions and courses of study *to conform to applicable standards of higher education.* Preventing an institution of higher learning from embarking upon programs it has neither the resources nor the faculty *to sustain on a level of excellence* is quite different from abolishing a major function allotted to an institution as the basic purpose for which it was founded and which has continued as one of its major activities through the years.

My interpretation of Art. XIII–A is strengthened by considering it in relation to this Amendment's Section 4, which authorizes private and denominational institutions of higher learning to become "coordinated with the State System of Higher Education under regulations set forth by" the State Regents. Obviously, such institutions would not desire to become coordinated with the System if this meant changing their basic functions against the will of their own governing boards. Any such meaning would preclude all hope that such institutions would accede to coordinating with the State System. Once again, we must assume that the framers of Art. XIII–A did not intend to write into it a vain or futile provision.

Lastly, I think the matter of "predominant emphasis" is of questionable importance and relevancy. It has never been the policy or practice in this State's agricultural and mechanical colleges to abjure teaching in other fields. The territorial statutes established a "normal school", but the University of Oklahoma was to have a "normal department", Okla.Stats.1890, §§ 6788, 6792. The Territorial Agricultural College was not confined to purely agricultural and mechanical studies. See Okla.Stats. 1890, § 241:

> "The design of the institution is to afford practical instruction in agriculture and the natural sciences connected therewith, *and also the sciences which bear directly upon all industrial arts and pursuits.* The course of instruction shall embrace the English language and literature, mathematics, civil engineering, agricultural chemistry, animal and vegetable anatomy and physiology, the veterinary art, entomology, geology and such other natural sciences as may be prescribed; political, rural, and household economy, horticulture, moral philosophy, history, bookkeeping and especially the application of science and the mechanic arts to practical agriculture in the field."

I do not think that Murray College would cease to be an agricultural and mechanical college merely because it might set up major courses of study in English or Political Science. And I do not think that a nose

count of its students pursuing such majors would determine whether it ceased to be an agricultural and mechanical college. Certainly, the Oklahoma State University of today has not forfeited its standing as an institution devoted to agricultural and mechanical education because it offers advanced training and graduate degrees in other fields. In short, I do not believe that diversification or a shift in emphasis has any effect upon the classification of an institution for the purpose of constitutional assignment to a particular Board, so long as there is a substantial activity in the classification. We are not called upon to determine the effect of a complete abandonment of all agricultural and mechanical education at Murray. The record does not show that this has happened there.

In accord with the foregoing, I would hold Senate Bill 214, supra, unconstitutional, and reverse the judgment of the trial court. I therefore respectfully dissent.