STATE OF NEBRASKA EX REL. ROBERT M. SPIRE, ATTORNEY GENERAL OF THE STATE OF NEBRASKA, RELATOR, V. ALLEN J. BEERMANN, SECRETARY OF STATE OF THE STATE OF NEBRASKA, RESPONDENT.

455 N.W.2d 749

Filed May 18, 1990.    No. 89-738.

Robert M. Spire, Attorney General, and Harold I. Mosher for relator.

Dean G. Kratz and Patrick J. Barrett, of McGrath, North, Mullin & Kratz, for respondent.

Bert L. Overcash and Gary B. Schneider, of Woods & Aitken, for amicus curiae Board of Trustees of the Nebraska State Colleges.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

PER CURIAM.

This is an original action concerning the alleged unconstitutionality of §§ 6 to 11 of 1989 Neb. Laws, L.B. 247, of the Ninety-first Legislature, First Session, which legislation is now codified as Neb. Rev. Stat. §§ 85-1,118 to 85-1,123 (Supp. 1989).

Neb. Const. art. V, § 2, provides, in part: "No legislative act shall be held unconstitutional except by the concurrence of five judges."

Four judges of this court are of the opinion that the legislation in question is unconstitutional, while three judges of this court are of the opinion that the legislation is constitutional.

Therefore, since five judges of this court do not hold that §§ 6 to 11 of L.B. 247, that is, §§ 85-1,118 to 85-1,123, are unconstitutional, the aforementioned legislation is constitutional.

The following judges are of the opinion that the questioned legislation is unconstitutional: Boslaugh, Caporale, Grant, and Fahrnbruch, JJ.

The relator, as the Attorney General of the State of

Nebraska, issued a written opinion that §§ 6 to 11 of L.B. 247 of the Ninety-first Legislature, First Session, legislation now codified as §§ 85-1,118 to 85-1,123, are unconstitutional. In substance, the legislation which was the subject of the Attorney General's opinion terminates the existence of Kearney State College as one of the state colleges in Nebraska and incorporates Kearney State College into the system of the University of Nebraska. Relying on the Attorney General's opinion concerning L.B. 247, the members of the Board of Trustees of the Nebraska State Colleges, who are among the state officers required to act under the legislation in question, have refused to implement §§ 6 to 11 of L.B. 247.

Pursuant to Neb. Rev. Stat. § 84-215 (Reissue 1987), the Attorney General brought an action for judicial determination and declaration that §§ 6 to 11 of L.B. 247 are unconstitutional. Respondent is the Secretary of State of Nebraska, whose official duties include support for legislation alleged to be unconstitutional. See § 84-215. Because this is a civil action in which the State is a party, and because this action involves a matter of great public importance, requires a prompt answer, and does not involve any disputed fact, this court granted the Attorney General permission to file an original action in the Supreme Court of the State of Nebraska and prosecute the claim that the legislation is unconstitutional. See, Neb. Const. art. V, § 2; Neb. Rev. Stat. § 24-204 (Reissue 1989).

### THE ACT: L.B. 247

L.B. 247 has been enacted by the Legislature and was approved by the Governor on May 23, 1989. Sections 6 to 11 of L.B. 247 generally effect, inter alia, the transfer of Kearney State College to the University of Nebraska system and control by the university's Board of Regents.

Section 6 of L.B. 247 states:

> On July 1, 1991, the existing institution at Kearney known as Kearney State College shall be established as a university and shall be known as the University of Nebraska at Kearney. The University of Nebraska at Kearney shall be under the control and management of

and shall be administered by the Board of Regents of the University of Nebraska.

Section 7(1) of L.B. 247 provides, in part:

On July 1, 1991, all property rights, titles, assets, contracts, obligations, and choses in action of any kind existing as of June 30, 1991, owned, held, or controlled by Kearney State College or the Board of Trustees of the Nebraska State Colleges for the benefit of Kearney State College shall be transferred to, assumed by, and carried out by the Board of Regents of the University of Nebraska for the operation and benefit of the University of Nebraska at Kearney . . . .

Section 7(1)(c) of L.B. 247 further provides, in part, that "[p]rior to July 1, 1991, the board of trustees and the Board of Regents shall enter into such agreements as they deem necessary and appropriate to carry out the provisions of sections 6 to 11 of this act . . . ."

Section 8 of L.B. 247 prescribes: "The Board of Regents of the University of Nebraska shall have the power to prescribe the standards for the admission of students and to fix student fees, the curriculum, the degrees, and the certificate program for the University of Nebraska at Kearney."

Under § 9 of L.B. 247, "[t]he chief administrative officer of the University of Nebraska at Kearney shall be appointed by the Board of Regents of the University of Nebraska, shall hold office at the pleasure of the board, and shall receive such compensation as the board may prescribe."

Section 10 of L.B. 247 declares: "The provisions of Chapter 85 relating to the Board of Regents of the University of Nebraska shall be applicable to the University of Nebraska at Kearney except as modified or limited."

In part, § 11(1) of L.B. 247 contains the provision that

[t]here is hereby created the University of Nebraska at Kearney Cash Fund. . . . All money and funds accruing to the fund when appropriated by the Legislature shall be used for the maintenance and operation of the University of Nebraska at Kearney and shall at all times be subject to the orders of the Board of Regents.

Section 11(2) of L.B. 247 provides, in part, that "[t]here is

hereby created the University of Nebraska at Kearney Trust Fund . . . . The fund shall be held and managed in such manner as the Board of Regents shall determine."

CONSTITUTIONAL CHALLENGE AND RESPONSE

Neb. Const. art. VII, § 13, states:

The general government of the state colleges as now existing, and such other state colleges as may be established by law, shall be vested, under the direction of the Legislature, in a board of seven members to be styled as designated by the Legislature, six of whom shall be appointed by the Governor, with the advice and consent of the Legislature, two each for a term of two, four, and six years, and two each biennium thereafter for a term of six years, and the Commissioner of Education shall be a member ex officio. The duties and powers of the board shall be prescribed by law, and the members thereof shall receive no compensation for ·the performance of their duties, but may be reimbursed their actual expenses incurred therein.

In view of the foregoing provision in the Nebraska Constitution, the Attorney General contends that "the Legislature cannot alter, change[,] remove or transfer the 'general government of the state colleges as now existing, and such other state colleges as may be established by law' from the Board of Trustees of the Nebraska State Colleges," and concludes:

[S]o much of sections 6 to 11 of L.B. 247 that divest the general government of the existing institution of Kearney known as Kearney State College from the Board of Trustees of the Nebraska State Colleges and vests the general government of that institution in the Board of Regents of the University of Nebraska is in violation of section 13 of Article VII of the Constitution of the State of Nebraska.

Brief for relator at 25.

Among his assertions, the Secretary of State claims: "Legislative action is permitted so long as it does not divest the Trustees of the general government of the State Colleges. L.B.

247 does not divest the College Board of Trustees of the general government of the State Colleges and is thus constitutional." Brief for respondent at 6. Also, the Secretary of State contends that the Nebraska Constitution does not mandate existence of state colleges, which include Kearney State College.

### BURDEN AND STANDARDS—ALLEGED UNCONSTITUTIONALITY OF A STATUTE

"One claiming that a statute is unconstitutional has the burden to show that the questioned statute is unconstitutional." *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 265, 445 N.W.2d 284, 288 (1989). See, also, *State v. Comeau*, 233 Neb. 907, 448 N.W.2d 595 (1989); *Weiner v. State ex rel. Real Estate Comm.*, 217 Neb. 372, 348 N.W.2d 879 (1984). Unconstitutionality of a statute must be clearly demonstrated before a court can declare the statute unconstitutional. *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987).

*State v. LaChapelle*, 234 Neb. 458, 460, 451 N.W.2d 689, 690 (1990). Thus, in this case, the Attorney General has the burden to show that §§ 6 to 11 of L.B. 247 are unconstitutional.

We also recognize that before a court will render a judicial interpretation of language in a constitutional provision, it must be demonstrated that the questioned language is unclear or ambiguous and, therefore, requires judicial construction of the constitution. *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987); *State ex rel. School Dist. of Scottsbluff v. Ellis*, 168 Neb. 166, 95 N.W.2d 538 (1959).

Neb. Const. art. VII, § 13, provides that the government of the state colleges, and, thus, Kearney State College, is vested in the Board of Trustees of the Nebraska State Colleges. However, Neb. Const. art. VII, § 13, does not provide a clear answer to the question whether the Board of Trustees' constitutional right to govern the state colleges means that a state college, as an existing educational institution, which includes Kearney State College, must remain in existence as a state college. Thus, rules for interpreting constitutional provisions are applicable in this case.

The intent and understanding of [the] framers [of a

constitutional amendment] and the people who adopted it as expressed in the instrument is the main inquiry in construing it. . . . The words of a constitutional provision will be interpreted and understood in their most natural and obvious meaning unless the subject indicates or the text suggests they are used in a technical sense. The court may not supply any supposed omission, or add words to or take words from the provision as framed. It must be construed as a whole, and no part will be rejected as meaningless or surplusage, if it can be avoided. If the meaning is clear, the court will give to it the meaning that obviously would be accepted and understood by the layman. . . . It is permissible to consider the facts of history in determining the meaning of the language of the Constitution. . . . It is also appropriate and helpful to consider, in connection with the historical background, the evil and mischief attempted to be remedied, the objects sought to be accomplished, and the scope of the remedy its terms imply.

(Citations omitted.) *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 340-41, 37 N.W.2d 502, 507 (1949). See, also, *State ex rel. Douglas v. Beermann*, 216 Neb. 849, 347 N.W.2d 297 (1984); *Dwyer v. Omaha-Douglas Public Building Commission*, 188 Neb. 30, 195 N.W.2d 236 (1972).

Furthermore, "[c]onstitutional provisions should receive a broader and more liberal construction than statutory provisions and constitutions are not subject to the rules of strict construction." *Nebraska P. P. Dist. v. Hershey School Dist.*, 207 Neb. 412, 417-18, 299 N.W.2d 514, 518 (1980). See, also, *University Police Officers Union v. University of Nebraska*, 203 Neb. 4, 277 N.W.2d 529 (1979); *State ex rel. State Railway Commission v. Ramsey, supra.*

Finally, we note that this court's reliance "on other decisions by other courts which in turn relied upon provisions of other constitutions serves little purpose in determining the meaning of our own specific Constitution." *State ex rel. Spire v. Public Emp. Ret. Bd., supra* at 181, 410 N.W.2d at 466.

## FACTUAL BACKGROUND

The parties have stipulated that

> [t]he existing institution at Peru known as Peru State College was established as a state normal school in 1867; the existing institution at Kearney known as Kearney State College was established as a state normal school in 1903; the existing institution at Wayne known as Wayne State College was established as a state normal school in 1909; and the existing institution at Chadron known as Chadron State College was established as a state normal school in 1910.

All the aforementioned institutions were created and presently exist by legislative enactment.

Initially, Nebraska's four normal schools were governed by a statutorily created board consisting of seven members, of whom five were appointed by the Governor to a term of 5 years. The State Treasurer and State Superintendent of Public Instruction were also members of the board for the normal schools. See Rev. Stat. § 7057 (1913).

At the 1919-1920 constitutional convention for the State of Nebraska, it was proposed that the statutory board which had been governing the normal schools be given constitutional status. On the 18th day of the convention, Proposal No. 222 was offered to the convention:

> The general government of the state normal schools located at Peru, Kearney, Wayne and Chadron, and such other normal schools as may be established by law, shall be vested, under the direction of the legislature, in a board of seven members to be styled Board of Education of State Normal Schools, six of whom shall be appointed by the Governor, one each for a term of one, two, three, four, five and six years, and thereafter one each for a term of six years, and the State Superintendent of Public Instruction who shall be a member ex-officio. The duties and powers of said board shall be prescribed by law; and the members thereof shall receive no compensation for the performance of their duties, but may be reimbursed their actual expenses incurred therein.

1 Journal of the Nebraska Constitutional Convention 292

(1919-1920). Proposal No. 222 was referred to the convention's Committee on Education.

On the 39th day of the convention, Fred A. Nye, chairman of the Committee on Education, spoke on Proposal No. 222:

> On behalf of the Committee on Education I desire to state that when this proposal was under consideration it was unanimous before the Committee that the Normal Schools should be recognized in the Constitution in the same manner as are the universities and public schools. We are all aware that both the universities and public schools are based upon Constitutional provisions and that the Normal Schools are based upon legislative provisions. In order to give the normal schools an equal standing with the common schools and universities it was deemed advisable to recognize them in the Constitution for the reason that the normal schools have become one of the three great departments in our educational system. They perform special purposes and special functions and teach the youth of our state so that they may become teachers in the common schools; but that is not the only purpose of the normal schools. The normal schools, also, have a course of study which provides the student who gets out from the high school an opportunity to review the practical subjects that he will get in after life, and these schools also provide a course of study that the boy or girl who never go [sic] to high school and cannot afford to go to the university, may go there and at a nominal price take this course of study which is best suited to them for their after life. A vast amount of money has been spent by the state in building up these normal schools, so that it was the opinion of the Committee that these normal schools, being established as they are, and performing such a useful purpose as they are performing, should be recognized in the Constitution.
>
> In regard to the members of the normal board. We have made the number seven, that is the present number, which is composed of five who are appointed by the Governor and two ex-officio members, being the Superintendent of Public Instruction and the State Treasurer. We dropped

off the State Treasurer because he has always been merely a figurehead on the board, but we left on the State Superintendent for the reason that the common schools are under the control and management of the State Superintendent, and he looks to the normal schools primarily to furnish the teachers to teach in the common schools. It is very important to have the common schools and the normal schools closely associated and linked together, because the one cannot exist without the other and without one the other cannot successfully progress.

. . . .

THE SECRETARY: There was a Committee amendment which I will read now.

"Your Committee on Education respectfully reports for general file Proposal No. 222 amended as follows, to wit:

"[The amended Proposal No. 222 replaced 'the state normal schools located at Peru, Kearney, Wayne and Chadron,' with the phrase 'the state normal schools, as now existing.']"

MR. NYE: The reason for making the change is simply this, that we drop the location as it was in the original proposal, and simply inserted "The state normal schools as now existing." It was thought advisable to do that rather than to give prominence to the particular location by Constitutional provision.

1 Journal, *supra* at 746-47.

In its amended and final form, Proposal No. 222, passed by the convention, provided:

The general government of the state normal schools, as now existing, and such other normal schools as may be established by law, shall be vested, under the direction of the Legislature, in a board of seven members to be styled Board of Education of State Normal Schools, six of whom shall be appointed by the Governor, with the advice and consent of the Senate, two each for a term of two, four, and six years, and two each biennium thereafter for a term of six years, and the State Superintendent of Public Instruction shall be a member ex-officio. The duties and

powers of said board shall be prescribed by law, and the members thereof shall receive no compensation for the performance of their duties, but may be reimbursed their actual expenses incurred therein.

2 Journal of the Nebraska Constitutional Convention 2911-12 (1919-1920). As a constitutional amendment, Proposal No. 222 was approved by the voters in a special election on September 21, 1920, and became article VII, § 13, of the Nebraska Constitution.

In 1951, the Legislature passed L.B. 212, which proposed several constitutional amendments relating to creation of a State Department of Education. Regarding Neb. Const. art. VII, § 13, the proposed amendment substituted the phrase "Commissioner of Education" for "State Superintendent of Public Instruction" and the word "Legislature" for "Senate." At the general election in November 1952, voters approved the preceding amendments to article VII, § 13, of the Nebraska Constitution.

In 1967, the Legislature passed L.B. 174, which proposed the following amendment to Neb. Const. art. VII, § 13:

The general government of the state *colleges* as now existing, and such other *state colleges* as may be established by law, shall be vested, under the direction of the Legislature, in a board of seven members to be styled *as designated by the Legislature*, six of whom shall be appointed by the Governor, with the advice and consent of the Legislature, two each for a term of two, four, and six years, and two each biennium thereafter for a term of six years, and the Commissioner of Education shall be a member ex officio. The duties and powers of the board shall be prescribed by law, and the members thereof shall receive no compensation for the performance of their duties, but may be reimbursed their actual expenses incurred therein.

(Proposed amendatory language emphasized.) Thus, L.B. 174 proposed to designate the state's normal schools as "state colleges" and to allow the Legislature to specify the name of the governing body of such colleges.

At the public hearing on the proposed constitutional

amendment pursuant to L.B. 174, the reason for the proposed change was suggested by Dr. Freeman Decker of the State Normal Board:

> The name "normal school" is completely out of date, and has been a thorn in our side for a long time. We have been more concerned the last four or five years, because it makes it difficult to recruit faculty members. Normal school goes back hundreds of years. Historically, state normal schools offered one to two year courses in art of teaching. At present, few state normal schools exist; they become state colleges. We do not specify any given name, but could offer suggestions to the Legislature for a name.
>
> . . . .
>
> . . . When fighting to get faculty members, there are advantages to asking them to teach in teachers colleges.

Committee on Education Hearing, L.B. 174, 77th Leg. 7 (Jan. 30, 1967). The proposed constitutional amendments expressed in L.B. 174 were submitted to Nebraska voters and approved in the November 1968 general election.

Neb. Const. art. VII, § 13, has not been amended since 1968.

Although this court has never faced the precise issue involved in this case, namely, whether the Legislature may change the nature of a state college to a university, previous interpretations in decisions of this court relating to governing boards and commissions are helpful in the present case.

In *Rivett Lumber & Coal Co. v. Chicago & N. W. R. Co.*, 102 Neb. 492, 167 N.W. 570 (1918), this court, construing then-existing article V, § 19A, of the Nebraska Constitution, which provided that the "powers and duties of [the State Railway Commission] shall include the regulation of rates, service and general control of common carriers as the legislature may provide by law," stated:

> While the Constitution authorizes the legislature to provide by law how these powers and duties of the commission shall be exercised, it was clearly not intended that the legislature should confer the general power to regulate rates, service or control generally of common carriers upon some other body or jurisdiction. If the legislature under the Constitution could confer

jurisdiction upon the courts either to regulate rates or service or to control generally common carriers, it follows that it could confer jurisdiction to do all of the things enumerated in the railway commission statute, and the constitutional provision establishing a railway commission would then become nugatory.

102 Neb. at 494-95, 167 N.W. at 570.

In *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949), this court considered constitutionality of a legislative act which empowered the state's aeronautics department to regulate common carriers which transported by aircraft. At the time of *Ramsey*, Neb. Const. art. IV, § 20, provided:

The powers and duties of [the State Railway Commission] shall include the regulation of rates, service and general control of common carriers as the Legislature may provide by law. But, in the absence of specific legislation, the commission shall exercise the powers and perform the duties enumerated in this provision.

In *Ramsey*, this court found that "[t]he Legislature has no power to divest the State Railway Commission of its constitutional jurisdiction to regulate and control common carriers by air by transferring it to another body or jurisdiction." 151 Neb. at 347, 37 N.W.2d at 510.

In *State v. Kidder*, 173 Neb. 130, 133-34, 112 N.W.2d 759, 761 (1962), this court stated:

Article VII, section 1, of the Constitution of this state provides: "The general management of all lands and funds set apart for educational purposes, and for the investment of school funds, shall be vested, under the direction of the Legislature, in a board of five members to be known as the Board of Educational Lands and Funds. The members shall be appointed by the Governor with such qualifications and for such terms and compensation as the Legislature may provide."

The Board of Educational Lands and Funds has control of and the management of the school lands. See State v. Cooley, 156 Neb. 330, 56 N.W.2d 129.

As early as the case of State ex rel. Crounse v. Bartley,

40 Neb. 298, 58 N.W. 966, this court, in referring to the constitutional provision dealing with the management of school lands, said: "By this provision, the power to sell, lease, and manage the educational lands of the state is conferred upon a distinct board . . . . The authority thus conferred upon the board of commissioners, or board of educational lands and funds, as it is usually called, the legislature is powerless to take away."

Vesting general government of the University of Nebraska in the university's Board of Regents was discussed in *Board of Regents v. Exon*, 199 Neb. 146, 256 N.W.2d 330 (1977). As noted in *Exon*, the Legislature had enacted two appropriations bills which "contained numerous statements directing the Board of Regents or employees of the University to take certain actions." *Id.* at 149, 256 N.W.2d at 333. Neb. Const. art. VII, § 10, currently provides, as it did when *Exon* was decided, that "[t]he general government of the University of Nebraska shall, under the direction of the Legislature, be vested in . . . the Board of Regents . . . who shall be elected . . . . Their duties and powers shall be prescribed by law . . . ."

In regard to Neb. Const. art. VII, § 10, we stated:

We think it is clear that the purpose of the constitutional provision was to remove the University from the plenary control of the Legislature and establish the Board of Regents as an independent body charged with the power and responsibility to manage and operate the University as free from political influence and control as possible.

199 Neb. at 148, 256 N.W.2d at 332.

In *Exon*, this court found that the statutes involved were

either invalid or not applicable to the Board of Regents and the University because they relate to some act or function of the general government of the University which under the Constitution is vested in the Regents and can not be delegated to some other officer or department by the Legislature,

*id.* at 153, 256 N.W.2d at 335, and reasoned that

although the Legislature may add to or subtract from the powers and duties of the Regents, the general government of the University must remain vested in the Board of

> Regents and powers and duties that should remain in the Regents cannot be delegated to other officers or agencies.
>
> . . . .
>
> The Legislature can not use an appropriation bill to usurp the powers or duties of the Board of Regents and to give directions to the employees of the University. The general government of the University must remain vested in the Board of Regents. In prescribing the powers and duties of the Regents a legislative act must not be so detailed and specific in nature as to eliminate all discretion and authority on the part of the Regents as to how a duty shall be performed.

*Id.* at 149, 256 N.W.2d at 333.

We recently recognized in *State ex rel. Spire v. Northwestern Bell Tel. Co.*, 233 Neb. 262, 445 N.W.2d 284 (1989), as we likewise had recognized in *State ex rel. State Railway Commission v. Ramsey*, 151 Neb. 333, 37 N.W.2d 502 (1949), the principle that "[t]he Legislature cannot constitutionally divest the [Public Service Commission] of jurisdiction over a class of common carriers by vesting a governmental agency, body of government, or branch of government, except the Legislature, with control over the class of common carriers." 233 Neb. at 276, 445 N.W.2d at 294. The act involved in *Northwestern Bell*, 1986 Neb. Laws, L.B. 835 (now codified as Neb. Rev. Stat. §§ 86-801 et seq. (Reissue 1987)), was found to be constitutional, however, because the act was "specific legislation," under Neb. Const. art. IV, § 20, "prescribing the method and manner in which the PSC will exercise its regulatory activities concerning telephone companies." 233 Neb. at 279, 445 N.W.2d at 295. We specifically noted that the act did not "transfer regulatory control to a governmental agency, body of government, or branch of government except the Legislature." *Id.* at 277-78, 445 N.W.2d at 294.

Thus, the Attorney General argues that Kearney State College is one of the "existing" educational institutions specifically identified in Neb. Const. art. VII, § 13, which was previously amended as a result of the constitutional convention of 1919-1920. According to the Attorney General, since the general government of Kearney State College has been

constitutionally vested in the Board of Trustees of the Nebraska State Colleges, the Legislature cannot constitutionally delegate power to govern Kearney State College to another state agency or officer.

From our review of the minutes for the 1919-1920 constitutional convention, it is clear that the delegates to that convention intended that "the Normal Schools [state colleges] should be recognized in the Constitution in the same manner as are the universities and the public schools . . . for the reason that the normal schools have become one of the three great departments in our educational system." Indeed, the former normal schools at Kearney, Chadron, Peru, and Wayne did receive constitutional recognition and status, since the normal schools existed in 1920 at the time of the constitutional convention. Because Neb. Const. art. VII, § 13, as approved by the voters in 1920, referred to "the state normal schools, *as now existing*" (emphasis supplied), the existence of Kearney State College is mandated by the Nebraska Constitution.

Furthermore, the previous decisions of this court support the Attorney General's assertion that the general governance of Kearney State College may not be delegated by the Legislature to the Board of Regents of the University of Nebraska. Respondent argues, however, that L.B. 247 does not affect the Board of Trustees' right to govern the state colleges, since "[t]he Board's basic right of control is left untouched as all such powers of the Board continue to be exercised over State Colleges in Chadron, Wayne, Peru and any other State Colleges which may be established by the Legislature." Brief for respondent at 13. Such an argument is contrary to this court's holding in *Rivett Lumber & Coal Co. v. Chicago & N. W. R. Co.,* 102 Neb. 492, 167 N.W. 570 (1918), because, quite simply, if the Legislature could confer on the Board of Regents of the University of Nebraska the power to govern one state college, the Legislature could transfer *all* state colleges to the university system, and the constitutional provision establishing a Board of Trustees would then become nugatory. See, also, *State ex rel. State Railway Commission v. Ramsey, supra; State v. Kidder,* 173 Neb. 130, 112 N.W.2d 759 (1962); *Board of Regents v. Exon,* 199 Neb. 146, 256 N.W.2d 330 (1977) (once

the Constitution grants a board or commission the authority to govern or regulate certain entities, the Legislature may not delegate this authority to another board, commission, agency, or state officer). Moreover, common sense dictates that the Legislature may not accomplish the same unconstitutional delegation by simply changing the classification of Kearney State from "college" to "university."

Both parties in this case also direct our attention to a number of cases from other jurisdictions. However, those cases rely on interpretations of constitutional provisions different from provisions contained in the Nebraska Constitution and, therefore, provide little or no guidance for this case. *State ex rel. Spire v. Public Emp. Ret. Bd.*, 226 Neb. 176, 410 N.W.2d 463 (1987).

The clear intent of the framers of the Nebraska Constitution supports the Attorney General's contention that §§ 6 to 11 of L.B. 247 are unconstitutional.

For the foregoing reasons, we find that §§ 6 to 11 of 1989 Neb. Laws, L.B. 247, of the Ninety-first Legislature, First Session (now codified as Neb. Rev. Stat. §§ 85-1,118 to 85-1,123 (Supp. 1989)), are unconstitutional.

The following judges are of the opinion that the questioned legislation is constitutional: Hastings, C.J., White, and Shanahan, JJ.

SHANAHAN, J., dissenting.

The Nebraska Constitution's clearly expressed content concerning compulsory educational institutions contradicts any conclusion that Kearney State College, or any state college, must exist or continue to exist after legislative establishment in accordance with the Constitution. Yet, through invocation of principles for construing an ambiguous document, notwithstanding the clarity of the Nebraska Constitution regarding state colleges, this court's majority has judicially fashioned a provision for mandatory existence of Kearney State College from Neb. Const. art. VII, § 13, which provides: "The general government of the state colleges as now existing . . . shall be vested [in the Board of Trustees of the Nebraska State Colleges]."

Recognizing that judicial interpretation or construction of a document may be warranted to reach the meaning of an instrument, we have stated: "Ambiguity exists in an instrument when a word, phrase, or provision in the instrument has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings." *Knox v. Cook*, 233 Neb. 387, 391, 446 N.W.2d 1, 4 (1989). See, also, *Dammann v. Litty*, 234 Neb. 664, 452 N.W.2d 522 (1990); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988); *American Sec. Servs. v. Vodra*, 222 Neb. 480, 385 N.W.2d 73 (1986).

As will be demonstrated, rather than recourse to principles pertaining to resolution of ambiguity in a document, the majority should have been guided by several fundamental considerations in determining whether a statute withstands a challenge based on the allegation that the Legislature has exceeded its constitutional authority for legislation.

It is axiomatic that the Legislature of this state has vast authority and is limited only by the Nebraska and U.S. Constitutions. *State ex rel. Creighton Univ. v. Smith*, 217 Neb. 682, 353 N.W.2d 267 (1984); *Lenstrom v. Thone*, 209 Neb. 783, 311 N.W.2d 884 (1981). The Nebraska Constitution is, generally, a limitation on legislative power, not a grant of power to the Legislature. *State ex rel. Creighton Univ. v. Smith, supra*. Thus, "the Legislature may legislate upon any subject not inhibited by the Constitution." *Lenstrom v. Thone, supra* at 789, 311 N.W.2d at 888. See, also, *State ex rel. Creighton Univ. v. Smith, supra* at 688, 353 N.W.2d at 271: " 'Implied restrictions on the legislative power are not to be inferred unless the restriction is one that is clearly implied.' " Hence, a court may declare a statute unconstitutional only when the statute is genuinely repugnant to a controlling constitutional provision.

The Nebraska Constitution does not expressly prohibit the Legislature from enacting a law which changes a state educational institution's classification from a college to a university. Nevertheless, the majority apparently finds that such restriction on legislative power is implicit in Neb. Const. art. VII, § 13, because Kearney State College, formerly a normal school, was one of the educational institutions "now

existing" when the citizens of Nebraska adopted the amendment to Neb. Const. art. VII, § 13, in 1920. While the educational institution at Kearney is unquestionably a state college within Neb. Const. art VII, § 13, the conclusion that a state college must exist until abolition by future constitutional amendment is a quantum leap from mere mention about governance of state colleges in article VII, § 13, of this state's Constitution. To illustrate, suppose the Legislature passed legislation to establish a fifth state college, that is, a new state college in addition to the four current state colleges. The fifth state college would be governed by the Board of Trustees because the new state college is included within the constitutional language "the state colleges as now existing, and such other state colleges as may be established by law . . . ." However, according to the majority, the illustrative new or fifth state college, as a product of legitimate legislative power, would be endowed with constitutionally required and protected existence because the college had been "established by law." As a constitutionally questionable consequence of the majority's view of existence for a state college, the Legislature may properly give, but never take away.

All hypotheticals aside, it is obvious that existence of any state educational institution in Nebraska, with the exception of elementary and secondary schools, is not constitutionally mandated, an inescapable conclusion drawn from Neb. Const. art. VII, § 1:

> The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years. The Legislature may provide for the education of other persons in educational institutions owned and controlled by the state or a political subdivision thereof.

By the word "shall" in Neb. Const. art. VII, § 1, the Legislature is required to establish common schools. A common school is "a free public school now usu. including primary and secondary grades." Webster's Third New International Dictionary, Unabridged 459 (1981). Cf. *State, ex rel. Baldwin, v. Dorsey*, 108 Neb. 134, 187 N.W. 879 (1922). The word "may" in Neb. Const. art. VII, § 1, allows, but does

not compel, the Legislature to establish other educational institutions beyond the common schools, such as colleges and universities. The Legislature's discretionary power to create necessarily and correspondingly includes the discretionary power to amend, repeal, or abolish. As expressed in *Schumacher v. Rausch*, 190 Kan. 239, 244, 372 P.2d 1005, 1010 (1962): "Generally speaking, that which is purely a creature of the legislature is subject not only to the legislative power to create, but also to the legislative power to modify, dissolve or abolish." See, also, *Miller v. Jones*, 658 S.W.2d 888 (Ky. App. 1983); *Wencke v. City of Indianapolis*, 429 N.E.2d 295 (Ind. App. 1981); *Martin v. State Liq. Auth.*, 43 Misc. 2d 682, 252 N.Y.S.2d 365 (1964); *State ex rel. Bergin v. Washburn*, 224 Minn. 269, 28 N.W.2d 652 (1947). Cf. *State v. Houston*, 94 Neb. 445, 452, 143 N.W. 796, 799 (1913): "[A]n office created by the legislature may be abolished by that body." Thus, it is clear that the Nebraska Constitution does not mandate existence of Kearney State College, although existence of a state college may result from a discretionary exercise of legislative power. Pursuant to Neb. Const. art. VII, § 13, governance of the state colleges, whatever those institutions may be legislatively designated or denominated, must repose in the Board of Trustees of the Nebraska State Colleges. However, L.B. 247 does not alter any aspect of the general governance of the state colleges. Nevertheless, without any explicit constitutional basis and, more importantly, contrary to Neb. Const. art. VII, § 1, this court's majority has decided that the Nebraska Constitution, in its present form, demands existence of state colleges.

Although judicial decisions in other jurisdictions usually supply little assistance to ascertain the meaning of a particular provision in the Nebraska Constitution, *Kanaly v. State By and Through Janklow*, 368 N.W.2d 819 (S.D. 1985), is instructive in view of the substantial similarity of facts and provisions in the South Dakota Constitution. In *Kanaly*, South Dakota's Legislature enacted legislation which authorized closing the University of South Dakota at Springfield (USD/S), transferring control of the school's facilities to the Board of Charities and Corrections, and establishing a minimum security

prison at Springfield in place of the previous educational facility. The plaintiffs, who were South Dakota taxpayers, argued that Senate Bill 221 "violated Article XIV, § 3, of the South Dakota Constitution by transferring control of USD/S from the Board of Regents to the Board of Charities and Corrections." 368 N.W.2d at 822. South Dakota's Constitution, article XIV, § 3, which established the governing board for certain educational institutions in South Dakota, provided:

> The state university, the agricultural college, the school of mines and technology, the normal schools, a school for the deaf, a school for the blind, and all other educational institutions that may be sustained either wholly or in part by the state shall be under the control of a board of five members appointed by the Governor and confirmed by the senate under such rules and restrictions as the Legislature shall provide. The Legislature may increase the number of members to nine.

Thus, S.D. Const. art. XIV, § 3, is similar to Neb. Const. art. VII, § 13, in two important respects: (1) both state constitutions allowed the legislature to determine the duties and powers of the governing board of a state educational institution, and (2) although both constitutional provisions for governance refer to a number of educational institutions, neither provision expressly states that a particular institution must exist.

In response to the plaintiffs' contention in *Kanaly,* the Supreme Court of South Dakota stated:

> This Court has interpreted [S.D. Const. art. XIV, § 3] as creating a constitutional "administrative body charged with the control of all institutions of higher learning . . . ." . . . It does not, however, "establish the Regents as a fourth branch of government independent of any legislative policies." . . . The Regents' control is subject to constitutionally authorized legislative "rules and restrictions." . . . These legislative "rules and restrictions," however, "must stop short of removing all power." . . .

> Although the Board of Regents' control over some aspects of South Dakota educational institutions has been described as "vast and subject to little, if any, control" . . .

the Regents' control does not include the power of the purse . . . does not include the power to change the character of the institutions . . . does not include the power to create or establish schools . . . and does not include the power to determine the educational policy of this state . . . . The legislature has the power to create schools, to fund them as it has the power of the purse, and to establish state educational policy and this necessarily includes the power to close a school if efficiency and economy so direct. It is a legislative rule or restriction of the Regents' control and does not go so far as to remove all power because the Regents maintain their right of basic control over all other educational institutions. As stated above, an institution of higher education is not required by the constitution . . . to exist in Springfield.

(Citations omitted.) 368 N.W.2d at 825-26.

*Board of Reg., Okl. A. & M. Col. v. Oklahoma State Reg.*, 497 P.2d 1062 (Okla. 1972), supplies additional guidance for a decision in the present case. The Oklahoma Legislature enacted legislation which changed Murray State College of Agriculture and Applied Science, formerly governed by the Board of Regents for Oklahoma Agricultural and Mechanical Colleges, to Murray State College of Technology, which, pursuant to the questioned legislation, was governed by a newly established Board of Regents of Murray State College of Technology. The plaintiff contended that the legislation contravened Okla. Const. art. VI, § 31a, which established a "Board of Regents for the Oklahoma Agricultural and Mechanical College and all Agricultural and Mechanical Schools and Colleges maintained in whole or in part by the State" and argued that

the above Constitutional provision requires that Murray State College be governed by [the Board of Regents for Oklahoma Agricultural and Mechanical Colleges]; that the College has always been and continues to be an Agricultural and Mechanical College within the meaning of the Constitution, notwithstanding Senate Bill 214; and that the Legislature does not have the Constitutional authority to create a new governing board for the College.

497 P.2d at 1065. The plaintiff's argument in *Board of Reg.* is

nearly identical to the Attorney General's argument in the present case before this court, except in the present case the new governing board for the educational institution at Kearney already exists, whereas the governing board in the Oklahoma case was created by the questioned legislation. In rejecting the plaintiff's argument, the Supreme Court of Oklahoma stated:

> There is no language in § 31a, expressing an intent that all Agricultural and Mechanical Colleges which were under the management and control of the State Board of Agriculture when § 31a was adopted, shall be under and must continue to be under the management and control of the Board of Regents for the Oklahoma Agricultural and Mechanical Colleges. . . . We agree with plaintiff that the Legislature may not constitutionally remove the management and control of a School or College that comes within the meaning of § 31a, from the Board of Regents named therein and place its management and control in another Board. However, if the intent of § 31a, was to "freeze-in" such Schools and Colleges to be under the Board of Regents created therein, although such Schools and Colleges at some future date may not fall within the meaning of an Agricultural and Mechanical School or College, language would have been employed expressing such an intent.

497 P.2d at 1066-67. Similarly, if Kearney State exists as a state college, then the Board of Trustees of the Nebraska State Colleges must govern the college. However, there is no language in Neb. Const. art. VII, § 13, that requires that Kearney State shall remain a state college or that the school must exist in any particular form at all.

Consistent with the analysis of the Supreme Court of Oklahoma are this court's expressions that "[c]ourts must apply and must enforce the Constitution as it is written . . . and constitutional provisions are not open to construction as a matter of course" and that "[b]efore construing a constitutional provision, it must be demonstrated that its meaning is not clear and that construction is necessary." *State ex rel. Spire v. Public Emp. Ret. Bd.,* 226 Neb. 176, 178, 410 N.W.2d 463, 465 (1987).

As parts of a plan for state education, Neb. Const. art. VII,

§ 1, pertaining to common schools which must exist in response to the state Constitution's mandate, is unequivocally compatible with Neb. Const. art. VII, § 13, regarding governance of a state college which, by appropriate legislative choice, may exist or not exist. Consequently, the Nebraska Constitution clearly does not require the existence of a state college at Kearney and, as unambiguously expressed in Neb. Const. art. VII, § 1, leaves existence of all educational institutions beyond common schools to the Legislature's discretion. For that reason, it is both unnecessary and improper to explore the framers' intent in the Nebraska Constitution. Regarding the case now before this court, the language used by the framers of the Constitution speaks for itself: If a state college exists, general government of the state college lies with the constitutionally designated Board of Trustees, but the Nebraska Constitution requires only the existence of common schools and does not require existence of any educational institution beyond common schools. See Neb. Const. art. VII, §§ 1 and 13.

In the absence of a constitutional obligation imposed by the people of Nebraska, requiring the Legislature to continue existence of a state college as an educational institution, the very same people of Nebraska, through their elected representatives exercising legitimately unrestricted legislative power, may appropriately terminate an educational institution which has heretofore existed solely at the discretion of the Legislature. Hence, §§ 6 to 11 of L.B. 247 are constitutional as a proper exercise of legislative power in the State of Nebraska.

WHITE, J., joins in this dissent.

HASTINGS, C.J., dissenting.

I agree with the conclusion reached by Shanahan, J., in his dissenting opinion. The language of Neb. Const. art. VII, § 13, "[t]he general government of the state colleges as now existing," is, in my opinion, simply descriptive of a "state college." There is otherwise no definition of that term.

If that is true, there would seem to be little question but that the Legislature could abolish one or more of the state colleges as now existing. Perhaps the language of L.B. 247 could have been

more affirmative in its abolishment. However, the language "[t]he existing institution at Kearney known as Kearney State College shall be established as a university" would seem to leave no doubt but that the "state college" was being abolished.

Expanding further on the quotation in the dissenting opinion of Shanahan, J., taken from *Kanaly v. State By and Through Janklow*, 368 N.W.2d 819 (S.D. 1985):

> Section 1 of S.B. 221 places the "*Springfield minimum security prison*, formerly [U]niversity of South Dakota at Springfield . . . under the control of the board of charities and corrections." (Emphasis supplied.) Therefore, this language does not place the control of USD/S and its educational programs under the jurisdiction of the Board of Charities and Corrections. . . . Thus, the Board of Regents maintained control until the termination of the educational programs offered at USD/S. Appellants' contentions in opposition are not sustainable due to the express language of the legislative act. The Board of Charities and Corrections was given control of the Springfield minimum-security prison, not USD/S.

368 N.W.2d at 826.

In like manner, the Board of Regents of the University of Nebraska was given control of the University of Nebraska at Kearney, not Kearney State College.

WHITE, J., joins in this dissent.

## CONCLUSION

As a result of article V, § 2, of the Nebraska Constitution, §§ 6 to 11 of 1989 Neb. Laws, L.B. 247, of the Ninety-first Legislature, First Session (now codified as Neb. Rev. Stat. §§ 85-1,118 to 85-1,123 (Supp. 1989)), are constitutional.